# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2018

No. 17-20364

Lyle W. Cayce
Clerk

PATRICK J. COLLINS; MARCUS J. LIOTTA; WILLIAM M. HITCHCOCK,

Plaintiffs–Appellants,

v.

STEVEN T. MNUCHIN, SECRETARY, U.S. DEPARTMENT OF
TREASURY; DEPARTMENT OF THE TREASURY; FEDERAL HOUSING
FINANCE AGENCY; MELVIN L. WATT,

Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and HAYNES and WILLETT, Circuit Judges.
PER CURIAM:[1]

A decade ago, the United States was engulfed in perhaps the worst
financial crisis since the Great Depression. Toxic mortgage debt had poisoned
the global financial system. Hoping to reverse a national housing-market
meltdown, Congress passed the Housing and Economic Recovery Act of 2008
("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (codified in various sections of
12 U.S.C.). Among other things, HERA created a new independent federal

---

[1] Chief Judge Stewart joins in the entire opinion and judgment except for Section
II.B.2 and the judgment on the constitutional issue; Judge Haynes joins in the entire opinion
and judgment; Judge Willett joins in the entire opinion and judgment except for Section II.A
and the judgment on the statutory issue.

No. 17-20364

entity—the Federal Housing Finance Agency ("FHFA")—to oversee two of the nation's largest financial companies, government-chartered mainstays of the U.S. mortgage market: the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").

Since their inception, these twin mortgage-finance giants have always been government-sponsored entities ("GSEs"). But Fannie and Freddie are also private corporations with private stockholders, and many investors are disenchanted with the Federal Government's management. This case is the latest in a series of shareholder challenges to an agreement between the FHFA, as conservator to Fannie and Freddie, and the Treasury Department. Under the 2012 agreement, Treasury provided billions of taxpayer dollars in capital. In exchange, Fannie and Freddie were required to pay Treasury quarterly dividends equal to their entire net worth. This exchange is known as the "net worth sweep," and aggrieved investors are unhappy with the bailout terms.

Plaintiffs–Appellants Patrick J. Collins, Marcus J. Liotta, and William M. Hitchcock (collectively "Shareholders") are Fannie Mae and Freddie Mac shareholders. They sued the FHFA and its Director, as well as Treasury and its Secretary, arguing that the agreement rendered their shares valueless. They contend that Treasury and the FHFA (collectively the "Agencies") exceeded their statutory authority under HERA and that the agreement was arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"). They also claim that the FHFA is unconstitutionally structured in violation of Article II, §§ 1 and 3 of the Constitution because, among other things, the agency is headed by a single Director removable only for cause, does not depend on congressional appropriations, and evades meaningful judicial review. The district court dismissed the Shareholders' statutory claims and granted summary judgment in favor of the Agencies on the constitutional claim.

2

No. 17-20364

Because we find that the FHFA acted within its statutory authority by adopting the net worth sweep, we hold that the Shareholders' APA claims are barred by § 4617(f). But we also find that the FHFA is unconstitutionally structured and violates the separation of powers. Accordingly, we AFFIRM in part and REVERSE in part.

## I. BACKGROUND

### A.    Fannie and Freddie

The foundation of the United States housing market is built on two entities: Fannie Mae and Freddie Mac. Congress created Fannie Mae in 1938 to "provide stability in the secondary market for residential mortgages," to "increas[e] the liquidity of mortgage investments," and to "promote access to mortgage credit throughout the Nation."[2] Congress created Freddie Mac in 1970 to "increase the availability of mortgage credit for the financing of urgently needed housing."[3] Both Fannie and Freddie are now publicly traded, for-profit corporations. Together, they purchase and guarantee mortgages originating in private banks and bundle them into mortgage-backed securities. In doing so, these GSEs leverage shareholder investments to provide liquidity to the residential mortgage market, ensuring that homeownership is a realistic goal for American families.

### B.    The Recession

In 2007, the housing market collapsed,[4] and the United States economy fell into a severe recession. At the time, Fannie and Freddie controlled

---

[2] 12 U.S.C. §§ 1716, 1717

[3] Federal Home Loan Mortgage Corporation Act, Pub. L. No. 91-351, preamble, 84 Stat. 450 (1970).

[4] The financial crisis was caused, in part, by a series of mortgage loans to borrowers with poor credit, known as "subprime" mortgages. *Crash Course: The Origins of the Financial Crisis*, ECONOMIST (Sept. 7, 2013), https://www.economist.com/news/schoolsbrief/21584534-effects-financial-crisis-are-still-being-felt-five-years-article. Lenders eased their standards for subprime mortgages, requiring little or no down-payment or income documentation, and

combined mortgage portfolios valued at approximately $5 trillion—nearly half of the United States mortgage market. As essential players in the housing market, Fannie and Freddie suffered multi-billion dollar losses. Indeed, the GSEs lost more in 2008 ($108 billion) than they had earned in the previous thirty-seven years combined ($95 billion).[5] Yet the GSEs remained solvent. Because they had taken a relatively conservative approach to the riskier mortgages that were issued in the years preceding the recession, they remained in comparatively sound financial condition. As a result, Fannie and Freddie continued to support the United States home mortgage system as distressed banks failed.

## C.    The FHFA and HERA

During the summer of 2008, President Bush signed HERA into law in an effort to protect the fragile national economy from further losses. HERA established the FHFA as an "independent" agency and classified Fannie and Freddie as "regulated entit[ies]" subject to the direct "supervision" of the FHFA.[6] Separately, HERA granted Treasury temporary authority "to

---

loans often came with discounted interest rates that reset after two years. JOINT CENTER FOR HOUSING STUDIES OF HARVARD UNIVERSITY, *The State of the Nation's Housing: 2008*, at 2 (2008), https://web.archive.org/web/20100630164105/http://www.jchs.harvard.edu/publications/markets/son2008/son2008.pdf. Even the GSEs relaxed their lending standards to compete with private banks. *See* Charles Duhigg, *Pressured to Take More Risk, Fannie Reached Tipping Point*, N.Y. TIMES (Oct. 4, 2008), https://www.nytimes.com/2008/10/05/business/05fannie.html. Subprime mortgages were then pooled together to back securities that received deceptively high credit ratings. ECONOMIST, *supra*. Home prices suffered a steep decline in 2006. *Justin Lahart, Egg Cracks Differ in Housing, Finance Shells*, WALL ST. J. (Dec. 24, 2007), https://www.wsj.com/articles/SB119845906460548071?mod=googlenews_wsj. As a result, subprime borrowers defaulted on their mortgages, and foreclosures drastically increased. *See* HARVARD UNIVERSITY, *supra* at 3.

[5] Office of Inspector General (OIG), FHFA, *Analysis of the 2012 Amendments to the Senior Preferred Stock Purchase Agreements* 5 (Mar. 20, 2013), https://www.fhfaoig.gov/Content/Files/WPR-2013-002_2.pdf.

[6] 12 U.S.C. § 4511(a), (b).

purchase any obligations and other securities" issued by the GSEs,[7] so long as Treasury determined that the terms of purchase would "protect the taxpayer,"[8] and imposed "limitations on the payment of dividends."[9] HERA terminated Treasury's authority to purchase securities on December 31, 2009.[10] After that, Treasury was only authorized to "hold, exercise any rights received in connection with, or sell, any obligations or securities [it] purchased."[11]

How Congress chose to structure the FHFA through HERA is central to this appeal.

### 1. Authority

The FHFA possesses broad discretion to exercise regulatory and enforcement authority over the GSEs' operations.

We first outline the FHFA's regulatory authority. HERA charges the FHFA Director with the broad duty to "oversee the prudential operations" of the GSEs and to ensure that: the GSEs "operate[] in a safe and sound manner, including maintenance of adequate capital and internal controls;" "the operations and activities of each regulated entity foster liquid, efficient, competitive, and resilient national housing finance markets;" and the GSEs' activities "are consistent with the public interest."[12] The Director may issue "any regulations, guidelines, or orders necessary to carry out" this duty.[13]

Next, we turn to FHFA's enforcement authority. For one, the Director may issue and serve a "notice of charges" to the GSE or an entity-affiliated party if the party is, or is reasonably suspected of, engaging in "unsafe or

---

[7] *Id.* §§ 1455(l)(1)(A), 1719(g)(1)(A).

[8] *Id.* §§ 1455(l)(1)(B)(iii), 1719(g)(1)(B)(iii).

[9] *Id.* §§ 1455(l)(1)(C)(vi), 1719(g)(1)(C)(vi).

[10] *Id.* §§ 1455(l)(4), 1719(g)(4).

[11] *Id.* §§ 1455(l)(2)(D), 1719(g)(2)(D).

[12] *Id.* § 4513(a)(1)(A), (B)(i), (B)(ii), (B)(v).

[13] *Id.* § 4526(a).

unsound practice[s] in conducting the business" of the GSE or otherwise violating laws, rules, or regulations imposed by the Director.[14] The notice of charge schedules a formal hearing, during which the FHFA determines whether to issue a cease and desist order.[15] After the hearing, the Director may issue the order and may require the entity to take "affirmative action to correct or remedy" the violation.[16] The Director can also: (1) obtain an injunction[17] in federal court to enforce his cease and desist orders; (2) seek judicial enforcement of outstanding notices or orders that the FHFA issued;[18] and (3) issue subpoenas,[19] which may be enforced in federal court.[20] Finally, the Director may "require the regulated entity to take such other action as the Director determines appropriate."[21]

Under certain circumstances, the Director may impose civil monetary penalties "on any regulated entity or any entity-affiliated party."[22] The Director must abide by certain conditions before imposing a penalty, such as providing notice to the entity and providing the opportunity for a hearing[23] before the FHFA. There are tiers of potential penalties depending on the severity of the offense, and the Director has wide discretion to determine the appropriate penalty.[24] The penalty "shall not be subject to review, except" by

---

[14] *See id.* § 4631(a)(1). The statute does impose some limits to the Director's authority, such as restrictions on the ability to enforce compliance with achieving housing goal provisions, among other things. *See id.* § 4631(a)(2).

[15] *Id.* at § 4631(c)(1).

[16] *Id.* at § 4631(c)(2).

[17] *Id.* § 4632(e).

[18] *See id.* § 4635.

[19] *Id.* § 4641(a).

[20] *See id.* § 4641(c).

[21] *Id.* at § 4631(d).

[22] *Id.* § 4636(a).

[23] The FHFA may conduct hearings regarding certain enforcement decisions; parties may appeal the outcome of the hearing to the D.C. Circuit. *See id.* §§ 4633, 4634(a).

[24] *Id.* § 4636(b), (c).

the D.C. Circuit.[25] If the penalized entity does not comply, the Director may sue to obtain a monetary judgment and "the validity and appropriateness of the order of the Director imposing the penalty shall not be subject to review."[26]

HERA also authorizes the FHFA Director to appoint the FHFA as either conservator or receiver for the GSEs, "for the purpose of reorganizing, rehabilitating, or winding up the[ir] affairs."[27]

Once appointed conservator or receiver, the FHFA enjoys sweeping authority over GSE operations. For example, the FHFA "may . . . take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity and conduct all business of the regulated entity."[28] The FHFA may also "collect all obligations and money due," "perform all functions of the regulated entity in the name of the regulated entity which are consistent with the appointment as conservator or receiver," "preserve and conserve the assets and property of the regulated entity," and "provide by contract for assistance in fulfilling any function, activity, action, or duty of the Agency as conservator or receiver."[29] And upon appointment, the FHFA "immediately succeed[s] to all rights, titles, powers, and privileges of such regulated entity with respect to the regulated entity and the assets of the regulated entity."[30] The FHFA also has discretion to "transfer or sell any asset or liability of the regulated entity in default, and may do so without any approval, assignment, or consent."[31]

---

[25] *Id.* § 4636(c), (d).

[26] *Id.* § 4636(d).

[27] *Id.* § 4617(a)(2).

[28] *Id.* § 4617(b)(2)(B)(i).

[29] *Id.* § 4617(b)(2)(B)(ii)–(v).

[30] *Id.* § 4617(b)(2)(A)(i).

[31] *Id.* § 4617(b)(2)(G); *see also id.* § 4617(b)(2)(H).

More specifically, as conservator, HERA authorizes the FHFA to "take such action as may be . . . (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."[32]

The FHFA also has broad incidental powers when it acts as conservator or receiver. The FHFA may "exercise all powers and authorities specifically granted to conservators or receivers, respectively, under this section, and such incidental powers as shall be necessary to carry out such powers," and it may "take any action authorized by this section, which the Agency determines is in the best interests of the regulated entity or the Agency."[33] The FHFA also has independent litigation authority; it may issue subpoenas,[34] "disaffirm or repudiate [certain] contract[s] or lease[s],"[35] and impose civil fines.[36]

### 2. Structure

The FHFA is led by a single Director, "appointed by the President, by and with the advice and consent of the Senate."[37] The Director must be a United States citizen who has "a demonstrated understanding of financial management or oversight, and ha[s] a demonstrated understanding of capital markets, including the mortgage securities markets and housing finance."[38] The Director is appointed for a five-year term[39] and may only be removed "for cause by the President."[40]

---

[32] *Id.* § 4617(b)(2)(D).
[33] *Id.* § 4617(b)(2)(J).
[34] *Id.* § 4617(b)(2)(I).
[35] *Id.* § 4617(d)(1).
[36] *See id.* § 4585.
[37] *Id.* § 4512(a), (b)(1).
[38] *Id.* § 4512(b)(1).
[39] *Id.* § 4512(b)(2).
[40] *Id.*

8

The Director is also responsible for picking three Deputy Directors.[41] And the Director has substantial influence over how the Deputy Directors may exercise their authority.[42]

The statute establishes the process for replacing a Director whose service terminates early due to "death, resignation, sickness, or absence."[43] In such case, "the President shall designate" a Deputy Director "to serve as acting Director until the return of the Director, or the appointment of a successor."[44] The newly appointed Director only serves the remainder of the former Director's term.[45] "An individual may serve as the Director after the expiration of the term for which appointed until a successor has been appointed."[46]

### 3. Oversight

Congress structured the FHFA as an independent agency.[47] The FHFA's operations as conservator are insulated from judicial review: "[N]o court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver."[48] Plus, the FHFA is funded through annual assessments collected from the "regulated entities" for reasonable costs and expenses of the running the FHFA.[49] The assessments are "not . . . subject

---

[41] *Id.* § 4512(c)(1) (Deputy Director of the Division of Enterprise Regulation), (d)(1) (Deputy Director of the Division of Federal Home Loan Bank Regulation), (e)(1) (Deputy Director for Housing Mission and Goals).

[42] *Id.* § 4512(c)(2), (d)(2), (e)(2).

[43] *Id.* § 4512(f).

[44] *Id.*

[45] *Id.* § 4512(b)(3).

[46] *Id.* § 4512(b)(4).

[47] Agencies may be classified as either independent or executive. Where the agency head is removable at will, the agency is "executive." *In re Aiken Cty.*, 645 F.3d 428, 439 (D.C. Cir. 2011), *subsequent mandamus proceeding*, 725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, J., concurring). But where the head or heads of an agency are removable only for cause, the agency "is an independent agency that operates free of presidential direction and supervision." *Id.*

[48] 12 U.S.C. § 4617(f).

[49] *Id.* § 4516(a).

to apportionment,"[50] and are "not . . . construed to be Government or public funds or appropriated money."[51]

The FHFA is overseen by the Federal Housing Finance Oversight Board ("Board"), which "advise[s] the Director with respect to the overall strategies and policies in carrying out" his duties.[52] The four-member Board includes two cabinet-level Executive Branch officials—the Secretary of the Treasury and the Secretary of Housing and Urban Development—the FHFA Director, and the Securities and Exchange Commission ("SEC") Chairperson.[53] The FHFA Director is the Board's Chairperson.[54] The Board meets at least quarterly, but it can meet more frequently by notice of the Director.[55] Beyond that, Board members may require a special meeting through written notice to the Director.[56] The Board is responsible for testifying annually before Congress about, among other things, the "safety and soundness" of the GSEs, "their overall operational status," and the "performance of the [FHFA]."[57] The Board may not "exercise any executive authority, and the Director may not delegate to the Board any of the functions, powers, or duties of the Director."[58] That is, the Board cannot *require* the FHFA or Director to do much of anything; the Board can only order "a special meeting of the Board."[59]

## D.    The Underlying Dispute

On September 6, 2008, the FHFA's Acting Director placed the GSEs into conservatorship. The next day, Treasury entered into Preferred Stock

---

[50] *Id.* § 4516(f)(3).
[51] *Id.* § 4516(f)(2).
[52] *Id.* § 4513a(a).
[53] *Id.*
[54] *Id.*
[55] *Id.* § 4513a(d)(1).
[56] *Id.* § 4513a(d)(2).
[57] *Id.* § 4513a(e).
[58] *Id.* § 4513a(b).
[59] *Id.* § 4513a(d)(2).

Purchase Agreements ("PSPAs") with the GSEs. Under the PSPAs, Treasury purchased large amounts of stock, infusing the GSEs with additional capital to ensure liquidity and stability. Treasury also provided the GSEs with access to a capital commitment, initially capped at $100 billion per GSE, to keep them from defaulting. In return, Treasury received one million senior preferred shares in each GSE. Those shares entitled Treasury to (1) a $1 billion senior liquidation preference; (2) a dollar-for-dollar increase in that preference each time Fannie or Freddie drew on Treasury's funding commitment; (3) quarterly dividends the GSEs could pay either at a rate of 10% of Treasury's liquidation preference or as a commitment to increase the liquidation preference by 12%; (4) warrants allowing Treasury to purchase up to 79.9% of common stock; and (5) the possibility of periodic commitment fees over and above any dividends. The PSPAs prohibited the GSEs from "declar[ing] or pay[ing] any dividend (preferred or otherwise) or mak[ing] any other distribution (by reduction of capital or otherwise)" without Treasury's consent.

Treasury and the FHFA subsequently amended the PSPAs. In May 2009, Treasury agreed to double its funding commitment to $200 billion for each GSE under the First Amendment. On December 24, 2009, Treasury agreed to further raise its commitment cap under the Second Amendment. This time, the cap was raised to an adjustable figure determined in part by the GSEs' quarterly cumulative losses between 2010 and 2012. On December 31, 2009, Treasury's authority to purchase GSE securities expired, leaving Treasury authorized only to "hold, exercise any rights received in connection with, or sell, any obligations or securities purchased."[60]

As of August 8, 2012, the GSEs had drawn approximately $189 billion from Treasury's funding commitment. Yet the GSEs still struggled to generate

---

[60] *Id.* §§ 1455(l)(2)(D), 1719(g)(2)(D); *see also id.* §§ 1455(l)(4), 1719(g)(4).

capital to pay the 10% dividend owed to Treasury. As a result, the FHFA and Treasury adopted the Third Amendment to the PSPAs on August 17, 2012.

The Third Amendment replaced the quarterly 10% dividend formula, with a requirement that the FHFA pay Treasury quarterly variable dividends equal to the GSEs' excess net worth after accounting for prescribed capital reserves. The capital reserve buffer started at $3 billion and decreased annually until it reached zero in 2018. Under the net worth sweep, the GSEs would no longer incur debt to make dividend payments, but they would also no longer accrue capital. Treasury also suspended the periodic commitment fee. Treasury believed this would "support a thoughtfully managed wind down" of the GSEs and observed that the GSEs "will not be allowed to retain profits, rebuild capital, [or] return to the market in their prior form."[61]

The net worth sweep transferred significant capital from Fannie and Freddie to Treasury. In 2013, the GSEs paid Treasury $130 billion in dividends. The following year, they paid $40 billion. And in 2015, they paid $15.8 billion. In the first quarter of 2016, Fannie Mae paid Treasury $2.9 billion, and Freddie Mac paid no dividend at all. Between the final quarter in 2012 and the first quarter of 2017, the GSEs generated over $214 billion. Thus, under the net worth sweep Treasury essentially recovered what the GSEs had drawn on Treasury's funding commitment.

## E.    Procedural History

In October 2016, shareholders of Fannie Mae and Freddie Mac sued the FHFA and its Director, as well as Treasury and its Secretary, challenging the net worth sweep on both statutory and constitutional grounds. First, the Shareholders brought a claim under the APA claiming that the FHFA, in

---

[61] *Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac*, U.S. DEP'T OF TREASURY (Aug. 17, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx.

agreeing to the Third Amendment net worth sweep provision, exceeded its statutory authority as conservator under HERA, 12 U.S.C. § 4617(b)(2)(D). Second, the Shareholders brought claims against Treasury under the APA, 5 U.S.C. §§ 702, 706(2)(C), (D), arguing that Treasury exceeded its statutory authority under HERA, 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(1)(B), (g)(4), by (1) purchasing securities after the sunset provision period, (2) failing to make the required determinations of necessity before purchasing securities, and (3) agreeing to the net worth sweep. Third, the Shareholders brought claims under the APA, 5 U.S.C. §§ 702, 706(2)(A), alleging that Treasury acted in an arbitrary and capricious manner by agreeing to the net worth sweep. Finally, the Shareholders brought a constitutional claim under Article II, §§ 1 and 3, alleging that the FHFA is unconstitutionally structured because, among other things, it is headed by a single Director removable only for cause. The Shareholders sought both declaratory and injunctive relief invalidating the Third Amendment and returning all dividend payments made to Treasury under the net worth sweep.

The Agencies moved to dismiss the three statutory claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) based on HERA's limitation on judicial review, 12 U.S.C. § 4617(f). Plaintiffs and Defendants filed cross-motions for summary judgment on the constitutional claim. The district court concluded, based on the D.C. Circuit's reasoning in *Perry Capital L.L.C. v. Mnuchin*, 848 F.3d 1072 (D.C. Cir. 2017), *amended by* 864 F.3d 591 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 978 (2018), *and cert. denied sub nom. Cacciapalle v. Fed. Hous. Fin. Agency*, 138 S. Ct. 978 (2018), that the Shareholders "fail[ed] to demonstrate that the FHFA's conduct was outside the scope of its broad statutory authority as conservator." And that "the effect of any injunction or declaratory judgment aimed at Treasury's adoption of the Third Amendment would have just as direct and immediate an effect as if the injunction operated

directly on FHFA." Thus, the district court granted the Agencies' motions to dismiss the statutory claims as "precluded by § 4617(f)." Finally, the court found that "FHFA's removal provision, when viewed in light of the agency's overall structure and purpose, does not impede the President's ability to perform his constitutional duty to take care that the laws are faithfully executed." The court therefore granted the FHFA's motion for summary judgment on the constitutional claim. The Shareholders timely appealed.

## II. DISCUSSION

This court "review[s] de novo a district court's rulings on a motion to dismiss and a motion for summary judgment, applying the same standard as the district court."[62] To survive a motion to dismiss, the Shareholders' complaint must state a valid claim for relief, viewed in the light most favorable to the plaintiff.[63] "[A] complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"[64] "[M]ere conclusory statements" are insufficient to state a claim.[65] A claim is facially plausible only when a plaintiff pleads facts "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[66]

## A.    Statutory Claims

The Shareholders' statutory claims mirror the claims made against the FHFA that the D.C., Sixth, and Seventh Circuits have all rejected.[67] We reject the Shareholders' statutory claims based on the same well-reasoned basis

---

[62] *TOTAL Gas & Power N. Am., Inc. v. Fed. Energy Reg. Comm'n*, 859 F.3d 325, 332 (5th Cir. 2017).

[63] *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 477 (5th Cir. 2002).

[64] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[65] *Id.*

[66] *Id.*

[67] *See Roberts v. Fed. Hous. Fin. Agency*, 889 F.3d 397, 399 (7th Cir. 2018); *Robinson v. Fed. Hous. Fin. Agency*, 876 F.3d 220 (6th Cir. 2017); *Perry Capital*, 864 F.3d at 598.

common to those courts' opinions.[68] HERA bars courts from taking "any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver."[69] Because the FHFA acted within its statutory authority, any potential exception to that bar does not apply.[70] The bar similarly applies to claims against the Department of Treasury that would "affect the exercise of powers or functions of the Agency as a conservator or receiver."[71] Consequently, we lack authority to grant relief on any of the Shareholders' statutory claims.

## B. The Constitutional Claim

The Shareholders claim the FHFA's structure violates the separation of powers because it is headed by a single Director removable only for cause. Despite statutory limitations on judicial review, we may exercise jurisdiction to consider a substantial constitutional claim.[72] Ordinarily, courts have a "duty . . . to construe the statute in order to save it from constitutional infirmities" and should be cautious of "overstat[ing] the matter" when describing the power and independence of the Director.[73] Before we examine the FHFA's structure,

---

[68] Because we find that the Shareholders' statutory claims are barred by § 4617(f), we need not resolve whether HERA's succession provision, 12 U.S.C. § 4617(b)(2)(A)(i) independently prevents the Shareholders from asserting their statutory claims.

[69] 12 U.S.C. § 4617(f).

[70] *See Roberts*, 889 F.3d at 402–06; *Robinson*, 876 F.3d at 227–32; *Perry Capital LLC*, 864 F.3d at 606–15.

[71] *See Roberts*, 889 F.3d at 406–08; *Robinson*, 876 F.3d at 228–29; *Perry Capital LLC*, 864 F.3d at 615–16.

[72] *See Garner v. U.S. Dep't of Labor*, 221 F.3d 822, 825 (5th Cir. 2000).

[73] *Morrison v. Olson*, 487 U.S. 654, 682 (1988); *see also INS v. Chadha*, 462 U.S. 919, 944 (1983). The Shareholders dispute that the presumption of constitutionality applies in separation-of-powers cases. Justice Scalia noted in his *Morrison* dissent that "harmonious functioning of the system demands that we ordinarily give some deference . . . to the actions of the political branches." 487 U.S. at 704 (Scalia, J., dissenting). But "where the issue pertains to separation of powers, and the political branches are . . . in disagreement, neither can be presumed correct." *Id.* at 704–05; *see also Freytag v. C.I.R.*, 501 U.S. 868, 879–80 (1991) (declining to defer to executive branch interpretation of statute alleged to violate the Appointments Clause because the "structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic"). Indeed,

No. 17-20364

we must determine whether the Shareholders have standing to bring their claim.

### 1. Standing

Federal courts are confined to adjudicating actual "cases" and "controversies."[74] That "requirement is satisfied only where a plaintiff has standing."[75] "Standing is a question of law that we review de novo."[76] At its "irreducible constitutional minimum," standing requires plaintiffs "to demonstrate: they have suffered an 'injury in fact'; the injury is 'fairly traceable' to the defendant's actions; and the injury will 'likely . . . be redressed by a favorable decision.'"[77] The party invoking federal jurisdiction bears the burden of establishing these elements.[78] And a plaintiff must demonstrate standing for each claim asserted.[79]

Standing for separation-of-powers claims is subject to a more relaxed inquiry: "Party litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights."[80] Under this standard, "a party is not required to show that he has received less favorable treatment

---

"the separation of powers does not depend on the views of individual Presidents . . . nor on whether the encroached-upon branch approves the encroachment." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 497 (2010) (internal quotation marks and citations omitted). Because this case disputes the Constitution's allocation of governing power, we do not defer to one branch's interpretation that would permit it to encroach on another branch's constitutional authority.

[74] U.S. CONST. art. III, § 2, cl. 1.

[75] *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008).

[76] *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002).

[77] *Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[78] *Lujan*, 504 U.S. at 561.

[79] *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

[80] *Buckley v. Valeo*, 424 U.S. 1, 117 (1976) (citations omitted).

than he would have if the agency were lawfully constituted."[81] In essence, the prophylactic, structural nature of the separation of powers justifies permitting claims beyond those where a "specific harm . . . can be identified."[82]

The FHFA argues that the Shareholders lack standing to assert their separation-of-powers claim because the Shareholders' claimed injury[83] is not traceable to the removal provision, nor would it be redressed if the restriction were held unconstitutional.

### a. Injury-in-fact

Generally, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."[84] The shareholder standing rule "prohibits shareholders from initiating actions to enforce the rights of [a] corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment."[85] "[S]hareholder[s] with a direct, personal interest in a cause of action," however, may "bring suit even if the corporation's rights are also implicated."[86]

The Shareholders assert that the unconstitutionally structured FHFA caused them direct economic injury—"[m]inority shareholders were directly and uniquely harmed by the expropriation of their rights" because this case

---

[81] *Comm. for Monetary Reform v. Bd. of Governors of Fed. Reserve Sys.*, 766 F.2d 538, 543 (D.C. Cir. 1985) (citing *Glidden Co. v. Zdanok*, 370 U.S. 530, 533 (1962) (plurality opinion)).

[82] *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995).

[83] The Agencies do not contest the Shareholders' injury-in-fact. Nevertheless, the court "must—where necessary—raise" standing issues sua sponte. *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 331–32 (5th Cir. 2002).

[84] *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

[85] *Id.*

[86] *Id.* at 336–37.

"concern[s] the transfer of *all* minority shareholder economic rights to a single, majority shareholder."

We agree. Divesting the Shareholders' property rights caused a direct injury.[87] In *Bowsher v. Synar*, for example, a statute required the President to issue an "order mandating the spending reductions specified by the Comptroller General."[88] The statute automatically suspended scheduled cost-of-living increases to National Treasury Employees Union members.[89] The Union filed suit alleging that the statute violated the separation of powers.[90] The Court found the Union had standing because it would "sustain injury by not receiving a scheduled increase in benefits."[91] The statutory deprivation of benefits was sufficient to injure Union members directly.[92]

Here, the transfer of the Shareholders' economic rights to Treasury by an allegedly unlawfully constituted agency resembles the statutory deprivation of benefits to the Union members in *Bowsher*. The Shareholders are directly and uniquely affected by the net worth sweep.

### b. Causation

Next, standing requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant."[93] Whether an injury is traceable to a defendant's conduct depends on "the causal connection between the assertedly unlawful

---

[87] *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714 (1986).
[88] *Id.* at 718.
[89] *Id.* at 719.
[90] *Id.* at 720.
[91] *Id.* at 721.
[92] *See id.* at 718–19.
[93] *Lujan*, 504 U.S. at 560 (cleaned up).

conduct and the alleged injury."[94] The injury cannot be "the result of the independent action of some third party not before the court."[95]

Because the FHFA was unconstitutionally insulated from executive control, the Shareholders argue that its actions are presumptively unconstitutional and thus void. In *Landry v. FDIC*, the D.C. Circuit noted that separation-of-powers matters justify a relaxed causation inquiry because "it will often be difficult or impossible for someone subject to a wrongly designed scheme to show that the design—the structure—played a causal role in his loss."[96] We endorse that inquiry here.

The FHFA argues that the Shareholders' harm is not traceable to the removal restriction for two reasons. First, the Third Amendment was the decision of an acting director whose designation was not subject to the for-cause removal restriction. Second, the FHFA does not exercise "executive" power; instead, the FHFA "steps into the shoes" of the GSEs—private financial institutions—when it acts as conservator. Neither argument is persuasive.

Section 4512(f) specifies when an acting Director may serve the FHFA in the Director's place.[97] The FHFA argues that because § 4512(f) does not specify a fixed term nor restrict the President's removal authority, the acting Director is not subject to the for-cause removal restriction. But if the acting Director could be removed at will, the FHFA would be an *executive* agency—not an independent agency. There is no indication that Congress sought to revoke the

---

[94] *Allen v. Wright*, 48 U.S. 737, 753 n.19, 757 (1984), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).

[95] *Lujan*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–41 (1976)).

[96] *Landry v. FDIC*, 204 F.3d 1125, 1130–31 (D.C. Cir. 2000); *see also Buckley*, 424 U.S. at 117.

[97] "In the event of the death, resignation, sickness, or absence of the Director, the President shall designate [one of the Deputy Directors] to serve as acting Director until the return of the Director, or the appointment of a successor." 12 U.S.C. § 4512(f).

FHFA's status as an independent agency when it is led by an acting, rather than appointed, Director.[98] So an acting Director, like an appointed one, is covered by the removal restriction.[99]

Second, the FHFA argues that it does not exercise executive functions that Article II vests in the Executive Branch. Under HERA, the FHFA as conservator succeeds to "all rights, titles, powers, and privileges" of the GSEs.[100] Courts interpret this provision as evincing Congress's intent for the FHFA to step into the shoes of the GSEs; although the FHFA is a federal agency, as conservator it "shed[s] its government character and also becom[es] a private party."[101] And the GSEs are undoubtedly private entities.[102]

When an agency acts as conservator, we have held that it does not exercise governmental functions. In *United States v. Beszborn*, the Government filed indictments against various defendants for their role in scheming to defraud financial institutions.[103] Earlier, however, the Resolution Trust Corporation ("RTC") participated in a civil action seeking punitive damages against the defendants as conservator to a financial institution based on the same conduct leading to criminal charges.[104] Our circuit assessed whether the government's prosecution following the RTC's role in the civil trial violated the Double Jeopardy Clause.[105] The court noted the "uniqueness" of the RTC's role as receiver: It was represented by private attorneys, and

---

[98] *See Wiener v. United States*, 357 U.S. 349, 353 (1958).

[99] *See* 12 U.S.C. § 4512(b)(2).

[100] *Id.* § 4617(b)(2)(A)(i).

[101] *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 579 (4th Cir. 2017); *see also O'Melveney & Myers v. FDIC*, 512 U.S. 79, 86–87 (1994) (interpreting the nearly identical provision 12 U.S.C. § 1821(d)(2)(A)(i)); *Perry Capital*, 864 F.3d at 622; *Herron v. Fannie Mae*, 861 F.3d 160, 169 (D.C. Cir. 2017).

[102] *See* 12 U.S.C. §§ 1452(a), 1723(b).

[103] 21 F.3d 62, 64–65 (5th Cir. 1994).

[104] *Id.* at 67.

[105] *Id.*

proceeds from successful actions benefited the creditors and stockholders of the institution it represented rather than the Treasury.[106] Thus, the court found that by acting as receiver, "the RTC stands as a private, non-governmental entity, and is not the Government for purpose of the Double Jeopardy Clause."[107]

In *Beszborn*, however, it was "the *conduct or actions* of the Government which the Double Jeopardy Clause seeks to limit."[108] The court reasoned that "[t]he rationale behind the protection of the Double Jeopardy Clause rests upon the doctrine that the Government or the sovereign with all of its power should not be allowed to make repeated attempts to convict an individual for an alleged offense."[109] As a result, whether or not the agency was acting as a receiver or regulator decided the issue of whether it violated constitutional protections. We emphasized that "for the Double Jeopardy Clause to have any application, there must be *actions by a sovereign*, which place the individual twice in jeopardy."[110] The separation of powers, however, rests on an entirely different foundation than the Double Jeopardy Clause.

Once again, the Supreme Court has emphasized the nature of the separation-of-powers principle as a "prophylactic device" and structural safeguard rather than a remedy available only when a specific harm is identified.[111] Whether the FHFA's specific conduct or actions were governmental in nature is not relevant—the structure of the agency is. In *Free Enterprise Fund*, for example, the Court considered the causation prong of

---

[106] *Id.* at 68.

[107] *Id.*

[108] *Id.* at 67 (emphasis added).

[109] *Id.*

[110] *Id.* (emphasis added).

[111] *See Plaut*, 514 U.S. at 239.

standing in the context of a separation-of-powers claim.[112] Like the Agencies in the instant case, the Public Company Accounting Oversight Board ("PCAOB") argued that petitioners lacked standing because their injuries were not fairly traceable to an invalid appointment.[113] The Court rejected this argument, finding that "standing does not require precise proof of what the PCAOB's policies might have been" had the agency's structure met constitutional requirements.[114]

Thus, to establish standing, the Shareholders are not required to show what the FHFA may have done had it been constitutionally structured.[115] Beyond its powers as conservator, the FHFA enjoys broad regulatory power over the GSEs.[116] And that regulatory power will continue to cast a shadow over the Shareholders' interests even after this case is resolved. As regulator, the FHFA has the ongoing potential to make decisions that affect the Shareholders' economic rights. We are satisfied that the Shareholders' injury is fairly traceable to the FHFA's unconstitutional structure.

### c. Redressability

Redressability examines "the causal connection between the alleged injury and the judicial relief requested."[117] "The point has always been the same: whether a plaintiff *personally* would benefit in a tangible way from the court's intervention."[118] "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[119]

---

[112] *See Free Enter. Fund*, 561 U.S. at 477.

[113] *Id.* at 512 n.12.

[114] *Id.*

[115] *See id.*

[116] 12 U.S.C. § 4511 *et seq.*

[117] *Allen*, 468 U.S. at 753 n.19.

[118] *Sprint Commc'ns Co.*, 554 U.S. at 300 (cleaned up).

[119] *Lujan*, 504 U.S. at 561 (cleaned up).

No. 17-20364

Treasury argues that there is no basis to set aside the Third Amendment, and thus ruling on FHFA's constitutionality would result in an impermissible advisory opinion.[120] In essence, Treasury argues severing the removal restriction would be the appropriate remedy for the Shareholders' claim, which would not resolve the Shareholders' injury.

We disagree. The Shareholders allege an *ongoing* injury—being subjected to enforcement or regulation by an unconstitutionally constituted body. This is consistent with standing in separation-of-powers cases. In *Free Enterprise*, for example, the Court concluded that the petitioners were "entitled to declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive."[121] Striking the removal provision was meaningful because a plaintiff was registered with the PCAOB and subject to its continuing jurisdiction, regulation, and investigation.[122] Declaratory relief addressing the constitutional issue stopped the ongoing injury from persisting. Petitioners thus had a tangible interest in ensuring that the PCAOB met constitutional requirements[123]—just like the Shareholders here.

The relationship between the FHFA and the Shareholders is sufficiently close to subject the Shareholders to FHFA oversight. In exercising its power as conservator, the FHFA has stepped into the shoes of the directors and managers charged with making decisions that directly affect the Shareholders' interests. As a result, the Shareholders' injury stems from the continued harm caused by the FHFA's ongoing conservatorship without executive oversight.

---

[120] *See Bayou Liberty Ass'n v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 397–98 (5th Cir. 2000).

[121] *Free Enter. Fund*, 561 U.S. at 513.

[122] *See* 561 U.S. at 487–88, 513.

[123] *Id.*

No. 17-20364

The relatively sparse case law seems to support this conclusion: The Supreme Court's most authoritative statement on Article III standing of shareholders and the prudential doctrine of shareholder standing came in *Franchise Tax Board of California v. Alcan Aluminium Ltd.*[124] There, a wholly-owned subsidiary was taxed by the state of California. The subsidiary's parent companies, rather than the subsidiary itself, sued for relief. The Supreme Court concluded that the parent companies clearly had standing.[125] But the "more difficult issue [was] whether respondents [could] meet the prudential requirements of . . . the so-called shareholder standing rule."[126] Although the Court left that issue unresolved, it left bread crumbs that resulted in courts using the direct–derivative action dichotomy for the shareholder standing rule.[127] Consistent with this approach, the Shareholders here assert direct, personal interest in their cause of action[128]—their security interests are subject to the FHFA's continuing jurisdiction, regulation, and control.

Because the Article III standard is subject to a more relaxed inquiry than the shareholder standing rule, we conclude that the Shareholders have Article III standing to seek declaratory relief. The FHFA as conservator and regulator has extensive authority and responsibility that impacts the Shareholders' rights. Vacatur of the net worth sweep alone would not fully resolve the

---

[124] 493 U.S. at 335.

[125] *Id.* at 336 ("If [taxes against the subsidiary] are higher than the law of the land allows, that method threatens to cause actual financial injury to [the parent companies] by illegally reducing the return on their investments in [the subsidiary] and by lowering the value of their stockholdings.").

[126] *Id.*

[127] *Id.* (stating that there is an exception to the shareholder standing rule for "a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated").

[128] We recognize that, while not a test for Article III standing, the shareholder standing rule is an exception to the prudential doctrine that could prevent the Shareholders' claims for want of standing.

24

Shareholders' constitutional injury—it fails to remedy the ongoing separation-of-powers violation.

We are satisfied that the Shareholders have standing to bring their constitutional claim.

### 2. The FHFA is Unconstitutionally Structured

Our Constitution divides the powers and responsibilities of governing across three co-equal branches. Each branch may exercise only the powers explicitly enumerated in the Constitution—executives execute, legislators legislate, and judges judge. This structural division of power aims to ensure no single branch becomes too powerful.[129] The Framers were not tinkerers; they upended things. The Revolution produced a revolutionary design. "Ambition must be made to counteract ambition."[130] The Constitution's unique architecture is "the central guarantee of a just government"[131] and essential to protecting individual liberty.[132]

Yet when one branch tries to impair the power of another, this upsets the co-equality of the branches and degrades the Constitution's deliberate

---

[129] *See* THE FEDERALIST NO. 47 (James Madison) ("The accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny.").

[130] THE FEDERALIST NO. 51 (James Madison).

[131] *Freytag*, 501 U.S. at 870.

[132] *See Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring) (explaining that our system of separated powers aims "to implement a fundamental insight: Concentration of power in the hands of a single branch is a threat to liberty"); *Mistretta v. United States*, 488 U.S. 361, 380 (1989) (citations omitted) ("This Court consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty."); *Morrison*, 487 U.S. at 697 (Scalia, J., dissenting) ("The Framers . . . viewed the principle of separation of powers as the absolutely central guarantee of a just Government."); *id.* ("Without a secure structure of separated powers, our Bill of Rights would be worthless."); *Bowsher*, 478 U.S. at 722 ("[C]hecks and balances [are] the foundation of a structure of government that would protect liberty."); *id.* at 730 ("The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty.").

separation of powers. Accordingly, the Supreme Court "ha[s] not hesitated to strike down provisions of law that *either* accrete to a single Branch powers more appropriately diffused among separate Branches *or* that undermine the authority and independence of one or another coordinate Branch."[133]

Here, the Shareholders assert the FHFA, as currently structured, undermines the separation of powers; they claim that the Executive Branch cannot adequately control the agency. Before evaluating the merits of the Shareholders' challenge, we must discuss the powers and obligations of the two branches implicated in this case.

Incidental to the exercise of its enumerated powers, Congress may establish independent agencies as "necessary and proper."[134] Over the past century, Congress has established dozens of independent agencies responsible for performing executive, regulatory, and quasi-judicial functions.[135] These independent agencies "wield[] vast power and touch[] almost every aspect of daily life."[136]

Congress often structures agencies to be independent from the Executive Branch in hopes that a measure of political insulation will enable the agencies to pursue policy objectives that (hopefully) yield long-term benefits.[137] To do

---

[133] *Mistretta*, 488 U.S. at 381 (emphasis added).

[134] *See Free Enter. Fund*, 561 U.S. at 515 (Breyer, J., dissenting) (citations omitted).

[135] *See PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 170 (D.C. Cir. 2018) (Kavanaugh, J., dissenting).

[136] *Free Enter. Fund*, 561 U.S. at 499; *see PHH Corp.*, 881 F.3d at 170 (Kavanaugh, J., dissenting) ("Ever since the 1935 *Humphrey's Executor* decision, independent agencies have played a significant role in the U.S. Government. The independent agencies possess extraordinary authority over vast swaths of American economic and social life—from securities to antitrust to telecommunications to labor to energy. The list goes on.").

[137] *See, e.g.*, *PHH Corp.*, 881 F.3d at 78 ("Congress has historically given a modicum of independence to financial regulators like the Federal Reserve, the FTC, and the Office of the Comptroller of the Currency. That independence shields the nation's economy from manipulation or self-dealing by political incumbents and enables such agencies to pursue the general public interest in the nation's longer-term economic stability and success, even where doing so might require action that is politically unpopular in the short term.").

so, Congress selects from a "menu of options"[138] in order "to structure the agency to be more or less insulated from presidential control."[139]

The quintessential independence-promoting mechanism is restricting the Executive Branch's ability to remove agency leaders at will. The Supreme Court in 1935 explained the rationale this way: "[O]ne who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will."[140] As a result, Congress will often permit the President to remove agency leadership only "for cause." And the Supreme Court has approved this design: "Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause."[141]

Beyond the removal restriction, Congress may impose other independence-promoting features.[142] For example, Congress may:

- Empower a single director or a body of co-equal leaders to manage the agency;

- Establish fixed terms of service for agency leadership;

- Mandate the agency be composed of a bipartisan leadership team;

- Exempt the agency from the standard appropriations process;

- Require the Senate to formally approve agency leadership nominations;

- Establish a formal oversight board that monitors and manages the independent agency's activities; and

---

[138] *See* Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 CORNELL L. REV. 769, 825 (2013).

[139] *See* Datla & Revesz, *supra* note 138, at 825.

[140] *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935).

[141] *Free Enter. Fund*, 561 U.S. at 483 (citations omitted).

[142] *See* Datla & Revesz, *supra* note 138, at 826–27 (recognizing agencies "fall along a continuum" ranging "from most insulated to least insulated from presidential control").

- Grant the agency unilateral litigation authority, untethered from the Department of Justice.[143]

Sometimes, Congress imposes multiple independence-promoting mechanisms. Ultimately, "an agency's practical degree of independence from presidential influence depends" on the combined effect of these (sometimes mutually reinforcing) structural features.[144]

While "[t]he Supreme Court has long recognized that, as deployed to shield certain agencies, a degree of independence is fully consonant with the Constitution,"[145] a vast "field of doubt" remains regarding how much Congress can insulate an independent agency from Executive Branch influence.[146] In other words: "where, in all this, is the role for oversight by an elected President?"[147]

The President's oversight role originates in Article II. The Constitution vests the "executive Power" in the President and obligates him to "take Care that the Laws be faithfully executed."[148] Independent agencies are staffed by subordinate executive officers,[149] so the President bears the ultimate responsibility for overseeing those officials.[150] Accordingly, "[s]ince 1789, the Constitution has been understood to empower the President to keep these officers accountable—by removing them from office, if necessary."[151] The

---

[143] *See generally id.*

[144] *Id.* at 824.

[145] *PHH Corp.*, 881 F.3d at 78.

[146] *Humphrey's Ex'r*, 295 U.S. at 632.

[147] *Free Enter. Fund*, 561 U.S. at 499; *id.* ("The Constitution requires that a President chosen by the entire Nation oversee the execution of the laws.").

[148] U.S. CONST. art. II § 1, cl. 1; *id.* § 3.

[149] *See Free Enter. Fund*, 561 U.S. at 483.

[150] *See id.*; *id.* at 492 ("It is *his* responsibility to take care that the laws be faithfully executed. The buck stops with the President, in Harry Truman's famous phrase.").

[151] *Id.* at 483 (citations omitted).

President cannot shirk this oversight obligation: "Abdication of responsibility is not part of the constitutional design."[152]

If an independent agency is *too* insulated from Executive Branch oversight, the separation of powers suffers. First, excessive insulation impairs the President's ability to fulfill his Article II oversight obligations.[153] By limiting his ability to oversee subordinates, Congress weakens the President's ability to fulfill his "constitutionally assigned duties, and thus undermines . . . the balance of constitutionally prescribed power among the branches."[154]

Second, excessive insulation allows Congress to accumulate power for itself. As the Supreme Court recognized, excessively insulating an independent agency from Executive Branch influence "provides a blueprint for extensive expansion of the legislative power."[155] Congress can expand its powers through its "plenary control over the salary, duties, and even existence of executive offices."[156] And without meaningful tools to oversee the agency, the President cannot counteract Congress's ambition.[157]

For these reasons, agencies may be independent, but they may not be isolated. Surveying the Supreme Court's removal-power cases, a unifying

---

[152] *Clinton*, 524 U.S. at 452 (1998) (Kennedy, J., concurring).

[153] *Cf. Free Enter. Fund*, 561 U.S. at 498 ("By granting the [Public Company Accounting Oversight] Board executive power without the Executive's oversight, this Act subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts. The Act's restrictions are incompatible with the Constitution's separation of powers.").

[154] Martin H. Redish & Elizabeth J. Cisar, *"If Angels Were to Govern": The Need for Pragmatic Formalism in Separation of Powers Theory*, 41 DUKE L.J. 449, 501 (1991) (footnote omitted); *see Free Enter. Fund*, 561 U.S. at 500 ("'Even when a branch does not arrogate power to itself,' . . . it must not 'impair another in the performance of its constitutional duties.'" (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996) (footnote omitted))).

[155] *Free Enter. Fund*, 561 U.S. at 500 (2010) (quoting *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 277 (1991)).

[156] *Id.*

[157] *See id.* ("Only Presidential oversight can counter its influence."); *id.* at 501 (citing THE FEDERALIST No. 51 (James Madison)).

principle emerges: The outer limit of Congress's ability to insulate independent agencies from executive oversight is the President's Article II obligation to ensure that the nation's laws are faithfully executed. In other words, Article II's Take Care Clause must impose a hard limit on what is "necessary and proper" under Article I.[158] Otherwise, Congress could insulate an agency to the point where the President could not adequately oversee the agency's activities, impairing the President's ability to fulfill his Article II obligations.[159] This excessive insulation upsets the separation of powers both by allowing Congress to weaken the President's performance of his constitutionally mandated duties *and* by allowing Congress to accumulate power for itself. Therefore, Congress cannot enshroud an agency in layers of independence-promoting insulation to the point at which the President cannot adequately control the agency's behavior.[160]

---

[158] Congress may establish independent agencies as "necessary and proper" in order to exercise its enumerated powers. But whatever Congress finds "necessary and proper" must be consistent with Constitution's "letter and spirit." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012) (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 421 (1819)); *id.* at 559 ("As our jurisprudence under the Necessary and Proper Clause has developed, we have been very deferential. . . . But we have also carried out our responsibility to declare unconstitutional those laws that undermine the structure of government established by the Constitution."); *see Free Enter. Fund*, 561 U.S. at 516 (Breyer, J., dissenting) ("The Necessary and Proper Clause does not grant Congress power to free *all* Executive Branch officials from dismissal at the will of the President.").

[159] *Free Enter. Fund*, 561 U.S. at 496 (finding that when the President could not hold agency officials accountable for their conduct, "his ability to execute the laws . . . [was] impaired" in violation of Article II); *see Humphrey's Ex'r*, 295 U.S. at 629. ("The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question.").

[160] *Free Enter. Fund*, 561 U.S. at 508 (holding that Congress cannot "deprive the President of adequate control over the [Public Company Accounting Oversight] Board, which is the regulator of first resort and the primary law enforcement authority for a vital sector of our economy").

No. 17-20364

To determine when insulating an independent agency from Executive Branch control goes too far, we must review the Supreme Court's leading removal-power cases.

### *a.* **Free Enterprise Fund**

The Supreme Court in *Free Enterprise Fund* evaluated whether Public Company Accounting Oversight Board ("PCAOB") members were excessively insulated from Executive Branch control.

The PCAOB was a "nonprofit corporation" with "expansive powers to govern" foreign and domestic accounting firms that audit public companies to ensure compliance with our nation's securities laws.[161] Congress charged the SEC with the responsibility of overseeing the PCAOB.[162] Yet, Congress also "substantially insulated" PCAOB members "from the Commission's control."[163] PCAOB members could not be removed "except for good cause," and the Securities and Exchange Commissioners decided "whether good cause exist[ed]."[164] The President had virtually no oversight over the good-cause determination made by the SEC Commissioners; the President "was powerless to intervene—unless that determination [was] so unreasonable as to constitute inefficiency, neglect of duty, or malfeasance in office."[165] Thus, to the Court, none of those Commissioners were "subject to the President's direct control."[166]

The Court concluded that excessively insulating the PCAOB members through two layers of for-cause removal protection unconstitutionally impaired the President's ability to fulfill his Article II responsibility. Congress "withdr[ew] from the President any decision on whether . . . good cause exists"

---

[161] *Id.* at 484–85.
[162] *Id.* at 485.
[163] *Id.*
[164] *Id.* at 496.
[165] *Id.* (cleaned up).
[166] *Id.*

and "vested" that decision in SEC Commissioners.[167] This meant that the PCAOB was "not accountable to the President," and the President was "not responsible for the Board."[168] This arrangement was unconstitutional because:

> [n]either the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, ha[d] full control over the Board. The President [was] stripped of the power our precedents have preserved, and *his ability to execute the laws—by holding his subordinates accountable for their conduct—[was] impaired.*[169]

We draw three important lessons from *Free Enterprise.*

First, Congress may not "shelter the bureaucracy" to the point where executive officers are "immune from Presidential oversight."[170] We must not forget the Court's fear that, absent effective oversight tools, the Chief Executive could lose control over the Executive Branch.[171]

Second, to maintain "adequate control"[172] over his subordinates, the President must retain sticks that he can use to demand accountability—including the power to remove.[173] As the *Free Enterprise* Court made clear, Congress cannot transform the President into a "cajoler-in-chief" who can only offer carrots.[174]

---

[167] *Id.*

[168] *Id.*

[169] *Id.* at 496 (emphasis added).

[170] *Id.* at 497.

[171] *Id.* at 499 ("The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may *slip from the Executive's control*, and thus from that of the people." (emphasis added)).

[172] *Id.* at 508 (holding that Congress cannot "deprive the President of adequate control over the Board, which is the regulator of first resort and the primary law enforcement authority for a vital sector of our economy").

[173] *See id.* at 483–84; *id.* at 499.

[174] *Id.* at 501–02; *id.* ("The President . . . is not limited, as in Harry Truman's lament, to 'persuad[ing]' his unelected subordinates 'to do what they ought to do without persuasion.'" (alterations in original)); *id.* at 502 ("Congress cannot reduce the Chief Magistrate to a cajoler-in-chief.").

No. 17-20364

Third, we must look at the aggregate effect of the insulating mechanisms to determine whether an agency is excessively insulated. The Court in *Free Enterprise* explicitly recognized that "the language providing for good-cause removal" "working together" with "a number of statutory provisions" "produce[d] a constitutional violation."[175] Indeed, all nine Justices adopted this analytical approach.[176]

### *b.* **Morrison**

*Morrison* involved the constitutionality of the Ethics in Government Act ("EGA"), which permitted "the appointment of an 'independent counsel' to investigate and, if appropriate, prosecute certain high-ranking Government officials for violations of federal criminal laws."[177] The EGA conferred upon the independent counsel protection from at-will removal by the Executive Branch.[178]

The independent counsel was an "inferior officer"[179] within the Executive Branch, who was "subject to good-cause removal by a higher Executive Branch

---

[175] *See id.* at 509.

[176] Justice Breyer—dissenting and joined by Justices Stevens, Ginsburg and Sotomayor—followed roughly the same analytical framework. The dissent recognized that the removal restriction's constitutionality must be decided "in light of the provision's practical functioning in context," *id.* at 523 (Breyer, J., dissenting), because "[i]n practical terms no 'for cause' provision can, in isolation, define the *full measure* of executive power," *id.* at 524 (emphasis added). Congress's agency-design decisions—such as the agency's "scope of power" and funding—"affect the President's power to get something done." *See id.* Thus, the dissent posed the central question as: "To what extent [] is the . . . 'for cause' [removal] provision likely, as a practical matter, to limit the President's exercise of executive authority?" *Id.* The dissent concluded that, even with the removal restriction, the President—through his "constitutionally sufficient" control over the SEC—could adequately control the PCAOB. *Id.* at 528–30. In other words, after evaluating the cumulative effect of the insulating mechanisms, the dissent concluded the President could still adequately control the PCAOB.

[177] *Morrison*, 487 U.S. at 660 (footnote omitted).

[178] *Id.* at 663; *id.* at 686 (recognizing that the Attorney General may remove the independent counsel for good cause, after following a statutorily-prescribed process).

[179] The Court reached this conclusion when evaluating the claim that the EGA violated Article II's Appointments Clause. We do not find it necessary to recite the Court's reasoning. We note, however, that this conclusion influenced the Court's subsequent analysis of the separation-of-powers challenge.

official" (i.e., the Attorney General).[180] The counsel had no "authority to formulate policy for the Government or the Executive Branch, nor . . . [authority to exercise] any administrative duties outside of those necessary to operate her office."[181] The counsel could "only act within the scope of the jurisdiction that ha[d] been granted by the Special Division[182] pursuant to a request by the Attorney General."[183] The Attorney General—a principal executive officer who is removable at will by the President—exercised substantial oversight over the authority and actions of the independent counsel.

Although the EGA provided the independent counsel protection from at-will removal, the Court found this removal restriction did not "sufficiently deprive[] the President of control over the independent counsel to interfere impermissibly with his constitutional obligation to ensure the faithful execution of the laws."[184] The Court recognized that the separation of powers aims to ensure "Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II."[185] But it concluded that the removal restriction did not "impede the President's ability to perform his constitutional duty."[186] This is because the EGA provided the Executive Branch various other tools to supervise and control the independent counsel.[187] For example:

---

[180] *Id.* at 671, 686.

[181] *Id.* at 671–72.

[182] The Special Division was "a special court . . . created by the Act 'for the purpose of appointing independent counsels.'" *Id.* at 661.

[183] *Id.* at 672.

[184] *Id.* at 693.

[185] *Id.* at 689.

[186] *Id.* at 691.

[187] *Id.* at 695–96 ("It is undeniable that the Act reduces the amount of control or supervision that the Attorney General and, through him, the President exercises over the

- The independent counsel may be appointed only following a "specific request by the Attorney General, and the Attorney General's decision not to request appointment if he finds 'no reasonable grounds to believe that further investigation is warranted' is committed to his unreviewable discretion."[188] This gave "the Executive a degree of control over the power to initiate an investigation by the independent counsel."[189]

- The independent counsel's jurisdiction was "defined with reference to the facts submitted by the Attorney General."[190]

- "[O]nce a counsel [was] appointed, the Act require[d] that the counsel abide by Justice Department policy unless it [was] not 'possible' to do so."[191]

Considering the combined effect of the EGA's provisions, the Court concluded that "[n]otwithstanding the fact that the counsel [was] *to some degree* 'independent' and free from executive supervision . . . [those] features of the Act g[a]ve the Executive Branch *sufficient control* over the independent counsel to ensure that the President [was] able to perform his constitutionally assigned duties."[192] Congress, in effect, compensated for the removal restriction by providing the Executive Branch other effective tools to monitor and control the independent counsel. Thus, the *Morrison* Court held, the independent counsel was not excessively insulated from presidential control, so there was no separation-of-powers violation.[193]

\*   \*   \*

The overarching imperative to prevent an agency from being unconstitutionally insulated from Executive Branch oversight explains why an

---

investigation and prosecution of a certain class of alleged criminal activity. . . . Nonetheless, the Act does give the Attorney General several means of supervising or controlling the prosecutorial powers that may be wielded by an independent counsel.").

[188] *Id.* at 696.

[189] *Id.*

[190] *Id.*

[191] *Id.*

[192] *Id.* at 696 (emphasis added).

[193] *See id.* at 697.

at-will removal limit survived in *Morrison* but died in *Free Enterprise*. Restricting at-will removal of PCAOB Members in *Free Enterprise*—in combination with the other mechanisms that insulated the PCAOB from executive oversight—went too far.[194] But in *Morrison*, the Executive retained tools to meaningfully oversee the independent counsel, despite the removal restriction. After considering the combined effect of the provisions governing the independent counsel, the *Morrison* Court concluded that Congress had not excessively insulated the independent counsel from the Executive Branch.[195]

Congress cannot isolate an independent agency from meaningful executive oversight. Otherwise, the President could not fulfill his Article II responsibility to ensure the faithful execution of the nation's laws, thus undermining the separation of powers.

### c. The FHFA

We hold that Congress insulated the FHFA to the point where the Executive Branch cannot control the FHFA or hold it accountable.[196] We reach this conclusion after assessing the combined effect of the: (1) for-cause removal restriction; (2) single-Director leadership structure; (3) lack of a bipartisan leadership composition requirement; (4) funding stream outside the normal appropriations process; and (5) Federal Housing Finance Oversight Board's purely advisory oversight role.

---

[194] *Free Enter. Fund*, 561 U.S. at 509 ("It is true that the language providing for good-cause removal is only one of a number of statutory provisions that, *working together*, produce a constitutional violation.") (emphasis added).

[195] *See Morrison*, 487 U.S. at 696.

[196] Admittedly, measuring the degree of insulation is difficult—especially when each insulating feature, standing alone, may pass constitutional muster. Nevertheless, we must remain faithful to the Supreme Court's guidance and engage in a fact-specific inquiry to decide whether the various insulating provisions, "working together, produce a constitutional violation." *See Free Enter. Fund*, 561 U.S. at 509.

No. 17-20364

### i.    *The for-cause removal restriction*

The President may remove the FHFA Director only "for cause." Limiting the President to only "for cause" removal dulls an important tool[197] for supervising the FHFA because the agency is protected from Executive influence and oversight.[198] Although the power to remove "for cause" may be a dull oversight tool,[199] limiting the President to "for cause" removal is not sufficient to trigger a separation-of-powers violation.[200] Cognizant of this

---

[197] Query whether a policy disagreement constitutes cause to remove. *See* Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 TEXAS L. REV. 15, 27 (2010) (footnote omitted) ("Though the issue has not been decided by the Supreme Court, most commentators agree that it is not good cause for removal if an agency performs a lawful regulatory agency action that the President disagrees with as a matter of policy.").

[198] *See* Neal Devins & David E. Lewis, *Not-So Independent Agencies: Party Polarization and the Limits of Institutional Design*, 88 B.U. L. REV. 459, 488 (2008) (finding that when "[p]residents cannot fire independent-agency heads on policy grounds . . . [they] have been constrained in their efforts to direct independent-agency policy making."); Lisa Schultz Bressman & Robert B. Thompson, *The Future of Agency Independence*, 63 VAND. L. REV. 599, 611 (2010) ("[A] President who cannot remove the personnel of the agency for policy disagreements lacks a key method to impose administration views."); *see also* Datla & Revesz, *supra* note 138, at 787 (footnote omitted) ("The ability to remove an agency head at will is an enforcement tool that helps the President ensure that the agency follows his policy preferences."); Barkow, *supra* note 197, at 28 ("Empirical studies on when Congress opts for good-cause provisions support the view that this design feature seems largely aimed at stopping presidential pressure [on independent agencies]."); *id.* at 30 ("A removal restriction undoubtedly gives an agency head greater confidence to challenge presidential pressure.").

[199] Indeed, the contours of "for cause" removal are uncertain. "No recent President has attempted to remove the head of an independent agency for cause . . . ." Datla & Revesz, *supra* note 138, at 788; *id.* at 787–89 (theorizing that the uncertainty regarding what constitutes "for cause" removal and the potential political costs of litigating the issue discourage Presidents from firing agency officials for cause).

Also, statutory provisions governing how to *replace* the FHFA Director may blunt the effectiveness of "for cause" removal. If the Director is absent, a Deputy Director (chosen by the recently removed former Director) is designated by the President to serve as the FHFA's acting Director. *See* 12 U.S.C. § 4512. This former Deputy serves as acting Director until "the appointment of a successor" following a formal appointment proceeding. Even if a President removes the Director "for cause," the President must designate an acting Director from the ranks of Deputy Directors whom the recently removed Director selected. And the President cannot install the Director of his choice until the Senate approves his replacement. These speedbumps to appointing a replacement Director render for-cause removal an impotent oversight mechanism.

[200] *See Free Enter. Fund*, 561 U.S. at 483 (citations omitted).

restriction, we consider whether this and other independence-promoting mechanisms—"working together"[201]—excessively insulate the FHFA, violating the separation of powers.

### ii. Single-Director agency leadership

The FHFA's single-Director structure further insulates the Agency from presidential influence and oversight.

Traditionally, independent agencies are governed by multi-member bodies.[202] Early examples of agencies whose directors were protected from at-will removal—such as the Interstate Commerce Commission and the Federal Trade Commission—were "multi-member bodies: They were designed as non-partisan expert agencies that could neutrally and impartially issue rules, initiate law enforcement actions, and conduct or review administrative adjudications."[203]

The distinction affects the President's ability to monitor independent agencies. In multi-member agencies whose leaders are protected from at-will removal, the President can still influence the agency through the power "to designate the chairs of the agencies and to remove chairs at will from the chair

---

[201] *See id.* at 509.

[202] *See generally PHH Corp.*, 881 F.3d at 177–79 (Kavanaugh, J., dissenting) (discussing the nation's "deeply rooted tradition—namely, that independent agencies are headed by multiple commissioners—[that] has been widely recognized by leading judges, congressional committees, and academics who have studied the issue").

[203] *See id.* at 169; *id.* at 173 ("Until this point in U.S. history, independent agencies exercising substantial executive authority have all been multi-member commissions or boards.").

position."[204] By designating a chair, a new President can "quickly" exert supervisory oversight.[205]

The FHFA has no chair. "[A] President may be stuck for years with a [FHFA] Director who was appointed by the prior President and who vehemently opposes the current President's agenda."[206] This "dramatic and meaningful difference vividly illustrates that the . . . single-Director structure diminishes Presidential power more than traditional multi-member independent agencies do."[207] Thus, the FHFA's single-Director leadership structure insulates the agency from presidential oversight.

### iii.    Lack of bipartisan balance

Another factor is whether the independent agency has a statutorily mandated requirement of bipartisan leadership.

A bipartisan leadership structure gives the President allies: "[C]ommon sense and existing scholarship point to the increasing identity of interests between the President and independent-agency commissioners from the president's party."[208] Even when the President inherits an agency led by the opposing party, he often can secure a majority of the leadership on the

---

[204] *See id.* at 166; *see* Datla & Revesz, *supra* note 138, at 796–97 (summarizing the chairperson's ability to influence agency direction and recognizing "it is clear that the ability to appoint the head of an independent agency allows the President to retain some control over that agency's activities"); Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 COLUM. L. REV. 573, 590 (1984) (explaining that the President can influence an independent agency's priorities and policymaking by designating a chairperson); *id.* at 590 n.68 ("The personal, political loyalty of the chairman assures the President a substantial impact on agency administration, and consequent influence on policy.").

[205] Barkow, *supra* note 197, at 38–39.

[206] *See PHH Corp.*, 881 F.3d at 167 (Kavanaugh, J., dissenting).

[207] *Id.*

[208] Devins & Lewis, *supra* note 198, at 491 (footnote omitted); *see also id.* ("[S]ystematic studies of both commissioner voting and the nomination process support our claim that, in this era of party polarization, independent-agency heads are especially likely to support the priorities of the political party they represent.").

governing board within the first two years of his term.[209] And "[o]nce the President has a majority of members of his or her party, the commissions fall in line with the President's priorities and positions."[210] Thus, bipartisan balance requirements bolster presidential involvement.

The FHFA, however, lacks this requirement. "Its single Director is from a single party—presumably the party of the President who appoints him."[211] Given the Director's fixed five-year term, the opposing party may dominate the Agency for the duration of the President's term.

Plus, bipartisan leadership requirements enhance Executive Branch oversight. Party members on an agency's governing board are "likely to . . . dissent if the agency goes too far in one direction,"[212] which serves as a "fire alarm" that alerts the President about controversial agency actions.[213] But, at the FHFA, no one is there to sound the alarm.

### iv.    Abnormal agency funding

An agency's funding stream bears on presidential influence.[214] If the agency is subject to the normal appropriations process, the President can veto a spending bill containing appropriations for the agency.[215] Also, the President

---

[209] *See* Barkow, *supra* note 197, at 38 (citations omitted) (finding that recent Presidents have managed to obtain a partisan majority on multi-member independent agencies in an average of twenty months (a historically slow rate)).

[210] Barkow, *supra* note 197, at 38; Devins & Lewis, *supra* note 198, at 498 (concluding "there is good reason to think that independent agencies will adhere to presidential preferences once a majority of commissioners are from the President's party").

[211] *See PHH Corp.*, 881 F.3d at 148 (Henderson, J., dissenting).

[212] *See* Barkow, *supra* note 197, at 41.

[213] *See id.*

[214] *See PHH Corp.*, 881 F.3d at 146–47 (Henderson, J., dissenting) (citation omitted); *see also* Barkow, *supra* note 197, at 43 ("To be sure, the power of the purse is one of the key ways in which democratic accountability is served." (footnote omitted)).

[215] *See PHH Corp.*, 881 F.3d at 147 (Henderson, J., dissenting) (citation omitted).

submits an annual budget to Congress, which he uses "to influence the policies of independent agencies."[216]

By placing an agency outside the normal appropriations process, the President loses "leverage" over the agency's activities.[217] As Justice Breyer's *Free Enterprise* dissent recognized, "who controls the agency's budget requests and funding" affects the "full measure of executive power" to oversee an agency; an agency's funding stream "affect[s] the President's ability to get something done."[218]

The FHFA stands outside the budget[219]— in stark contrast to "*nearly all* other administrative agencies"[220]—and is therefore immune from presidential control.

### v.   *No formal control over agency activities*

No statutory provision provides for formal Executive Branch control over the FHFA's activities. The closest thing is the statutorily created Federal Housing Finance Oversight Board (the "Board").[221] Two of the Board's four members are Cabinet officials who are beholden to the President: the Secretary of the Treasury and the Secretary of Housing and Urban Development. But the Board may not "exercise any executive authority, and the Director may not delegate to the Board any of the functions, powers, or duties of the Director."[222] The Board exercises purely advisory functions; it cannot *require* the FHFA or

---

[216] *Id.* (citation omitted).

[217] *See id.* at 147; Barkow, *supra* note 197, at 44 ("With independent funding, the agency is insulated from . . . the President." (footnote omitted)).

[218] *Free Enter. Fund*, 561 U.S. at 524 (Breyer, J., dissenting).

[219] 12 U.S.C. § 4516(f)(2); *see* HENRY B. HOGUE ET AL., CONG. RESEARCH SERV., R43391, INDEPENDENCE OF FEDERAL FINANCIAL REGULATORS: STRUCTURE, FUNDING, AND OTHER ISSUES 27 (2017).

[220] *Cf. PHH Corp.*, 881 F.3d at 146 (Henderson, J., dissenting) (citations omitted) (emphasis added).

[221] 12 U.S.C. § 4513a(a).

[222] *Id.* § 4513a(b).

Director to do anything—beyond ordering "a special meeting of the Board."[223] Thus, Cabinet officials—through the Board—can do nothing more than *cajole* the FHFA into acting.

This lack of formal involvement contrasts with situations where courts have upheld the insulation of independent agencies: *PHH* (the Consumer Financial Protection Bureau) and *Morrison* (independent counsel).

With respect to the Consumer Financial Protection Bureau ("CFPB"), the President, through the Financial Stability Oversight Council ("FSOC"), can influence the CFPB's activities.[224] The Council is comprised of ten voting members.[225] The Treasury Secretary is the Council's Chairperson.[226] The other voting members are heads of various independent agencies, including the SEC, Commodity Futures Trading Commission, CFPB, and FHFA.[227] "Significantly, a supermajority of persons on the Council are designated by the President."[228]

The FSOC holds veto-power over the CFPB's policies.[229] Specifically, the FSOC may "set aside a final regulation prescribed by the [CFPB], or any provision thereof, if the Council decides . . . the regulation or provision would put the safety and soundness of the United States banking system or the

---

[223] *Id.* § 4513a(d)(2).

[224] *See id.* § 5321.

[225] *Id.* § 5321(b)(1).

[226] *Id.* § 5321(b)(1)(A).

[227] *Id.* § 5321(b)(1). The President, with the advice and consent of the Senate, also appoints a voting "independent member . . . having insurance expertise" to the FSOC who serves a six-year term. *Id.* § 5321(b)(1)(J), (c)(1).

[228] *PHH Corp.*, 881 F.3d at 120 (Wilkins, J., concurring); *see id.* at 120 n.3 (Wilkins, J., concurring) (explaining that "the chairpersons of five independent agencies serve on the Council, each of whom the President has the opportunity to appoint either at the outset or near the beginning of the administration" and "[o]nly four members of the FSOC have terms longer than four years and are thus potentially not appointed by a one-term President").

[229] *See PHH Corp.*, 881 F.3d at 98; *id.* at 120–21 (Wilkins, J., concurring) (finding these "additional statutory requirements on CFPB action make[] the CFPB Director more accountable to the President").

stability of the financial system of the United States at risk."[230] "Any member of the Council can file a petition to stay or revoke a rule, which can be granted with a two-thirds majority vote."[231] This veto is a "powerful" oversight mechanism.[232] Thus, despite the CFPB's independent status, the Executive Branch retains an emergency brake to hold the CFPB accountable.[233]

With respect to the independent counsel in *Morrison*, the EGA established formal mechanisms for the Attorney General to oversee the independent counsel. And these mechanisms, in part, persuaded the Court to uphold the removal restriction.

In sum, there are no formal mechanisms by which the Executive Branch can control how the FHFA exercises authority. The only formal oversight body is the Federal Housing Finance Oversight Board—a *purely advisory* body that cannot impose its will on the FHFA. Although the Treasury Secretary is a member of the Board, she cannot pump the brakes on the FHFA's actions.

### d. There are no similarly insulated agencies.

The FHFA defends its constitutionality by asserting that it follows in a long line of independent agencies that courts have found to be constitutional— namely, the Federal Trade Commission, the Office of the Independent Counsel, and the Consumer Financial Protection Bureau. We see things differently. The

---

[230] *Id.* § 5513(a).

[231] *PHH Corp.*, 881 F.3d at 120 (Wilkins, J., concurring) (citing 12 U.S.C. § 5513).

[232] *Id.*

[233] Some question whether the FSOC is a "meaningful substitute check" on the CFPB's actions. *See id.* at 159–60 (Henderson, J., dissenting) ("The fact that anyone mentions the Council's narrow veto as a check is instead a testament to the CFPB's unaccountable policymaking power."). This magnifies the concern here: The FHFA lacks *any* oversight body.

FHFA is sui generis, and its unique constellation of insulating features offends the Constitution's separation of powers.

### i. *The FTC in* Humphrey's Executor

The FTC is an independent agency whose leaders are protected from at-will removal. The Supreme Court approved this arrangement 80-plus years ago in *Humphrey's Executor*—which the FHFA takes as validation.

But the Court has since clarified that *Humphrey's Executor* did not grant Congress blanket authority to create independent agencies whose leaders are protected from at-will removal.[234] The *Humphrey's Executor* Court established two demarcations regarding the President's oversight power: The President has "unrestrictable power to remove purely executive officers," and Congress may limit the President's power to remove commissioners of an independent agency that is "wholly disconnected from the executive department."[235] Between those poles lies a "field of doubt."[236]

The *Humphrey's Executor* Court's description of the FTC instructs how we tend the field. First, the Court described the FTC as "an administrative body created by Congress to carry into effect legislative policies" that "act[ed] in part quasi legislatively and in part quasi judicially."[237] The Court emphasized that the FTC "cannot in any proper sense be characterized as an arm or an eye of the executive."[238] And "any executive function" it does

---

[234] *See Free Enter. Fund*, 561 U.S. at 483 (reading *Humphrey's Executor* to mean that "Congress can, *under certain circumstances*, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause." (emphasis added)); *see also PHH Corp.*, 881 F.3d at 186 (Kavanaugh, J., dissenting) (interpreting *Humphrey's Executor* as limited to approving removal limitations for independent agencies with multi-member leadership structures).

[235] *Humphrey's Ex'r*, 295 U.S. at 630.

[236] *Id.* at 632.

[237] *Id.* at 628; *see id.* at 624 (finding the FTC's duties were "neither political nor executive, but predominantly quasi judicial and quasi legislative.").

[238] *Id.* at 628.

exercise—"as distinguished from executive power in the constitutional sense"[239]—is "in the discharge and effectuation of its quasi legislative or quasi judicial powers, or as an agency of the legislative or judicial departments of the government."[240] Thus, central to the Court's decision was its perception that the FTC did not exercise executive power.

This discussion highlights how the FTC differs from the FHFA. The FHFA—unlike the FTC[241]—exercises executive functions. For example, the FHFA can enforce rules that it creates through cease-and-desist orders and monetary civil penalties.[242] Thus, the FHFA can easily "be characterized as an arm or eye of the executive."[243]

Also, the FHFA lacks formal nonpartisanship requirements. The President appoints the Director, and the Director then appoints three deputies. Most likely, the agency's approach to exercising its broad discretion will slant toward the views of the President's party.[244] The FTC, on the other hand, is bipartisan.[245] The FTC is also structured to allow the President to choose a

---

[239] *Id.*

[240] *Id.* (footnote omitted).

[241] The *Morrison* Court acknowledged, however, that the *Humphrey's Executor* Court may have misperceived the FTC's authority: "[I]t is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." *Morrison*, 487 U.S. at 690 n.28 (citations omitted). The Court has not, however, formally abrogated the *Humphrey's Executor* holding.

[242] *See* 12 U.S.C. §§ 4585, 4636.

[243] *See Humphrey's Ex'r*, 295 U.S. at 628. Decades later, the *Morrison* Court de-emphasized the focus on the agency's function in favor of an approach that focused on "whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light." *Morrison*, 487 U.S. at 691.

[244] *See PHH Corp.*, 881 F.3d at 144–48 (Henderson, J., dissenting).

[245] *See Humphrey's Ex'r*, 295 U.S. at 628. *Compare* 15 U.S.C. § 41 (FTC) *with* 12 U.S.C. § 4512 (FHFA).

chairperson,[246] which allows the Executive Branch to wield considerable influence over the agency's priorities and actions.[247]

One final distinction: The FTC is subject to the traditional appropriations process.[248] "Accordingly, the FTC must go to the Congress every year with a detailed budget request explaining its expenditure of public money,"[249] which allows the President to monitor and shape the agency's activities.[250]

*Humphrey's Executor*, therefore, is inapposite. By structuring the FTC to preserve Executive Branch influence, Congress mitigated the impact of limiting the President's removal power. Congress did not stifle the President's ability to directly impact the agency. As a result, the President could fulfill his Article II responsibility, and the FTC survived constitutional challenge. The FHFA is a different beast.

### ii. *The independent counsel in* Morrison

The Executive Branch could exercise far greater control over the independent counsel as compared with the FHFA.[251] Indeed, the EGA gave the Executive Branch control over when and how the independent counsel performed its prosecutorial functions; this control was "sufficient" to allow the President to fulfill his Article II responsibilities.[252] No principal Executive Branch official can exert comparable influence over the FHFA.

---

[246] 15 U.S.C. § 41.

[247] *See supra* notes 202–213 and accompanying text.

[248] 15 U.S.C. § 42. *See generally PHH Corp.*, 881 F.3d at 146 (Henderson, J., dissenting).

[249] *PHH Corp.*, 881 F.3d at 146 (Henderson, J., dissenting).

[250] *See supra* notes 214–220 and accompanying text.

[251] *See supra* notes 177–193 and accompanying text; *see also Morrison*, 487 U.S. at 696; *PHH Corp.*, 881 F.3d at 176 (Kavanaugh, J., dissenting).

[252] *Morrison*, 487 U.S. at 696.

No. 17-20364

The FHFA Director also does not resemble the independent counsel. The independent counsel "exercised only executive power, not rulemaking or adjudicative power" and "had only a limited jurisdiction for particular defined criminal investigations."[253] Because the FHFA Director can *write and enforce* laws—as opposed to just enforcing existing laws—the FHFA Director "poses a more permanent threat to the President's faithful execution of the laws."[254]

### iii. *The CFPB in* PHH Corporation

The D.C. Circuit recently evaluated the constitutionality of the structure of the Consumer Financial Protection Bureau, an independent agency that exercises executive, legislative, and adjudicatory functions. Congress structurally insulated the CFPB from Executive Branch oversight; this insulation included a restriction on the President's ability to remove the CFPB's director at will.[255] Ultimately, the en banc court found the agency's structure constitutional.[256]

The D.C. Circuit found that "[t]he [Supreme] Court has consistently upheld ordinary for-cause removal restrictions like the one at issue here, while invalidating only provisions that either give Congress some role in the removal decision or otherwise make it abnormally difficult for the President to oversee an executive officer."[257] Following that framing, the court approved "Congress's application of a modest removal restriction to the CFPB, a financial regulator akin to the independent FTC in *Humphrey's Executor* and the independent

---

[253] *PHH Corp.*, 881 F.3d at 176 (Kavanaugh, J., dissenting).

[254] *Cf. id.* at 152–53 (Henderson, J., dissenting) (comparing the CFPB Director to the independent counsel).

[255] *Id.* at 78 (recognizing "[t]he Director may be fired only for 'inefficiency, neglect of duty, or malfeasance in office'" (quoting 12 U.S.C. § 5491(c)(3)).

[256] We compliment our colleagues for their numerous incisive, detailed opinions, from which we have drawn extensively.

[257] *Id.* at 85.

SEC in *Free Enterprise Fund*, with a sole head like the office of independent counsel in *Morrison*."[258]

The D.C. Circuit explained its conclusion as follows. First, the CFPB's structure was consistent with historical practice with regard to independent, financial regulatory agencies.[259] Second, "Congress validly decided that the CFPB needed a measure of independence and chose a constitutionally acceptable means to protect it,"[260] including budgetary independence.[261] Third, an agency led by a single director is likely as responsive to the Executive Branch as an agency with a multi-member leadership structure.[262] Finally, the D.C. Circuit disagreed with Judge Kavanaugh's dissenting position; according to the majority, the CFPB's novel structure was, standing alone, not constitutionally problematic,[263] nor did the CFPB lose under a freestanding "liberty" inquiry.[264] Ultimately, "[n]o relevant consideration g[ave] [the court] reason to doubt the constitutionality of the independent CFPB's single-member structure. Congress made constitutionally permissible institutional design choices for the CFPB with which courts should hesitate to interfere."[265]

We are mindful of our sister court's analysis regarding the FHFA's constitutionality. But salient distinctions between the agencies compel a contrary conclusion.

---

[258] *Id.* at 85. The D.C. Circuit also described the removal restrictions at-issue as "wholly ordinary" and "mild." *Id.* at 78.

[259] *Id.* at 91 ("Financial regulation, in particular, has long been thought to be well served by a degree of independence.").

[260] *Id.* at 92–93.

[261] *Id.* at 93.

[262] *Id.* ("[T]here is no reason to assume an agency headed by an individual will be less responsive to presidential supervision than one headed by a group.").

[263] *See id.* at 102–05.

[264] *See id.* at 105–06.

[265] *Id.* at 110. The D.C. Circuit seemed disturbed that PHH's position "call[ed] into question the structure of a host of independent agencies that make up the fabric of the administrative state." *Id.* at 93.

No. 17-20364

First, the agencies are structured differently. The Executive Branch can directly control the CFPB's actions through the FSOC—a feature the *PHH* majority found highly relevant.[266] The FHFA, on the other hand, has no formal oversight beyond the purely advisory Federal Housing Finance Oversight Board.

Second, the Shareholders here challenge not only the removal-power limitation or the FHFA's single-head structure. Instead, they challenge the FHFA's unconstitutional insulation from Executive Branch oversight—the *cumulative* effect of Congress's agency-design decisions. Indeed, as the D.C. Circuit recognized, "for two unproblematic structural features to become problematic in combination, they would have to affect the same constitutional concern and amplify each other in a constitutionally relevant way."[267] That is precisely the case here: The structural insulation of the FHFA Director—who may be appointed by a former President, who cannot be replaced at-will, and who is insulated from Executive Branch oversight—interferes with the President's ability to fulfill his duties under the Constitution.

\*    \*    \*

Article I cannot cannibalize Article II. Congress has broad discretion to establish independent agencies, but Congress cannot go so far as to impair the President's ability to fulfill his Article II obligations. The independent agencies Congress may establish may not be excessively insulated from Executive

---

[266] *Id.* at 98.

[267] *Id.* at 96; *see id.* at 85 (recognizing that the Supreme Court has invalidated statutory provisions that "make it abnormally difficult for the President to oversee an executive officer"); *id.* at 79 (framing its task as follows: "The ultimate purpose of our constitutional inquiry is to determine *whether the means of independence, as deployed at the agency in question, impedes* the President's ability under Article II of the Constitution to take Care that the Laws be faithfully executed" (cleaned up and emphasis added)).

Branch oversight—even if insulation is normatively desirable.[268] Article II is an outer limit on what is "necessary and proper."

In order to achieve a "workable government,"[269] the FHFA asks to us trust that *Congress* can adequately monitor the FHFA, altering the agency's budget or authority if necessary. But this highlights the separation-of-powers concern: The FHFA performs *executive* functions, but the agency's operations are subject primarily (if not exclusively) to *Congress's* will, divorced from Executive control. The Executive Branch should not—and, constitutionally, cannot—delegate to Congress the responsibility to ensure the faithful execution of the nation's laws.[270] And, even if Congress could fix the FHFA's unconstitutionality in the future, we must fulfill our own constitutional obligation here and now.[271]

We conclude that the FHFA's structure violates Article II. Congress encased the FHFA in so many layers of insulation—by limiting the President's power to remove and replace the FHFA's leadership, exempting the Agency's funding from the normal appropriations process, and establishing no formal mechanism for the Executive Branch to control the Agency's activities—that

---

[268] *See Free Enter. Fund*, 561 U.S. at 499.

[269] *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government.").

[270] *See Clinton*, 524 U.S. at 451–52 (Kennedy, J., concurring) ("Abdication of responsibility is not part of the constitutional design."); *see also Free Enter. Fund*, 561 U.S. at 497 ("The President can always choose to restrain himself in his dealings with subordinates. He cannot, however, . . . escape responsibility for his choices by pretending that they are not his own.").

[271] *See Free Enter. Fund*, 561 U.S. at 510 (recognizing that while "Congress of course remains free to" re-structure an agency, the Court cannot shirk its responsibility to remedy constitutional violations in cases before it); *PHH Corp.*, 881 F.3d at 158 (Henderson, J., dissenting) ("At all events, an otherwise invalid agency is no less invalid merely because the Congress can fix it at some undetermined point in the future.").

the end "result is a[n] [Agency] that is not accountable to the President."[272] The President has been "stripped of the power [the Supreme Court's] precedents have preserved, and his ability to execute the laws—by holding his subordinates accountable for their conduct—[has been] impaired."[273] In sum, while Congress may create an independent agency as a necessary and proper means to implement its enumerated powers, Congress may not insulate that agency from meaningful Executive Branch oversight.[274]

### 3. Relief Available for Separation-of-Powers Violations

Having concluded that the FHFA structure violates Article II, we must now determine what to do about it. When fashioning relief for constitutional violations, courts "try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact."[275] When a removal limitation crosses constitutional lines, courts routinely declare the limitation inoperative, prospectively correcting the error.[276] Severability is appropriate so long as the remaining statute remains "fully operative as a law with the tenure restrictions excised"[277] and nothing in the text or historical context of

---

[272] *Free Enter. Fund*, 561 U.S. at 496.

[273] *Id.*

[274] We do not question Congress's authority to establish independent agencies, nor do we decide the validity of any agency other than the FHFA. Governing through independent agencies may be normatively desirable. It may not be. That is neither here nor there: Our sole task is to decide whether the FHFA is constitutionally structured. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). We found, after an in-depth examination, that the FHFA is excessively insulated from Executive Branch influence and is, therefore, structured in violation of the Constitution. We leave for another day the question of whether other agencies suffer from similar constitutional infirmities.

And, of course, our opinion does not abrogate the *Morrison* Court's holding regarding the constitutionality of an independent agency tasked with investigating high-ranking Executive Branch officials.

[275] *Free Enter. Fund*, 561 U.S. at 508–09 (quotation marks and citation omitted).

[276] *See id.* at 508; *PHH Corp.*, 881 F.3d at 160–61 (Kavanaugh, J., dissenting); *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1133 (D.C. Cir. 2017).

[277] *Free Enter. Fund*, 561 U.S. at 509.

the statute makes it "evident" that Congress would have preferred no law at all to excising the restriction.[278] Indeed, there is a presumption that "the objectionable provision can be excised."[279] In doing so, courts routinely "accord[] validity to past acts of unconstitutionally structured governmental agencies."[280]

We conclude that severing the removal restriction from HERA is the proper remedy in the instant case. As a result, we leave the remainder of HERA undisturbed. The removal restriction itself has little effect on the remainder of HERA. In fact, HERA remains operative as a law without the restriction; its remaining provisions are capable of functioning independently from the removal restriction.[281] Given the exigent context in which the law was passed, it is unlikely that the entirety of HERA depended on a removal restriction. And though HERA contains no severability clause,[282] "there is nothing in the statute's text or historical context that makes it 'evident' that Congress, faced with the limitations imposed by the Constitution, would have preferred no [FHFA] at all" to one with a Director "removable at will" by the President.[283]

The appropriate remedy for the constitutional infirmity is to strike the language providing for good-cause removal from 12 U.S.C. § 4512(b)(2), restoring Executive Branch oversight to the FHFA. It is true here, as it was in *Free Enterprise Fund*, that the removal restriction is just one of several provisions that cumulatively offend the separation of powers. To be sure, we could "blue-pencil" other edits to HERA, but, as the Supreme Court advises,

---

[278] *Id.*

[279] *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).

[280] *John Doe Co.*, 849 F.3d at 1133 (citing *Buckley*, 424 U.S. at 142; *Citizens for Abatement of Aircraft Noise, Inc. v. Metropolitan Wash. Airports Auth.*, 917 F.2d 48, 57 (D.C. Cir. 1990), *aff'd*, 501 U.S. 252 (1991)); *see also Free Enter. Fund*, 51 U.S. at 508–09.

[281] *Free Enter. Fund*, 561 U.S. at 509.

[282] *See Alaska Airlines*, 480 U.S. at 686.

[283] *Free Enter. Fund*, 561 U.S. at 509.

No. 17-20364

"such editorial freedom . . . belongs to the Legislature, not the Judiciary."[284] We leave intact the remainder of HERA and the FHFA's past actions—including the Third Amendment. In striking the offending provision from HERA, the FHFA survives as a properly supervised executive agency.

### III. CONCLUSION

We AFFIRM the district court's order granting the Agencies' motions to dismiss the Shareholders' APA claims because such claims are barred by 12 U.S.C. § 4617(f).

We REVERSE the district court's order granting the Agencies' motion for summary judgment regarding the Shareholders' claim that the FHFA is unconstitutionally structured in violation of Article II and the Constitution's separation of powers, and we REMAND to the district court with instructions to enter judgment declaring the "for cause" limitation on removal of the FHFA's Director found in 12 U.S.C. § 4512(b)(2) violates the Constitution's separation-of-powers principles.

---

[284] *Id.* at 509–10.

No. 17-20364

CARL E. STEWART, Chief Judge, dissenting in part:

The constitutional issue presented by the Shareholders—whether the FHFA's structure impermissibly inhibits the President's ability to oversee and remove the Director consistent with his Article II obligation to "take care that the laws are faithfully executed"—does not lend itself to a clear-cut answer. As the panel majority's opinion states, Congress may mix and match a number of "features of independence" when crafting an independent agency's internal structure, subject of course to constitutional limitations set both within the Constitution's text and by Supreme Court precedent. These features include: placing formal constraints on the President's removal power through the use of "for-cause" removal restrictions, establishing a multimember leadership structure, subjecting agency heads to fixed terms of service, mandating that an agency be composed of a bipartisan leadership team, exempting the agency from the standard appropriations process, and granting the agency unilateral litigation authority. *See* P.C. Opn. at pg. 28; *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd*, 561 U.S. 477, 588 app. D (2010) (Breyer, J., dissenting). And Congress has used these features in several different combinations. Importantly, neither the presence nor absence of any given feature is dispositive of the agency's viability under Articles I and II and separation-of-powers principles.

The Supreme Court's Article II removal precedent, although sparse, has only rejected Congress's attempts to fashion independent agencies on two occasions. The first was in *Myers v. United States*, 272 U.S. 52, 60 (1926), in which Congress attempted to simultaneously limit the President's removal power and increase its own authority over the agency by conditioning the President's removal power on the Senate's advice and consent. This form of appropriation and aggrandizement was deemed violative of the Constitution's

separation of powers. The second was in *Free Enterprise Fund*, which presented an "extreme variation on the traditional good-cause removal standard" by doubly insulating members of Public Company Accounting Oversight Board with two layers of for-cause removal protection. *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 89 (D.C. Cir. 2018) (en banc). These cases and others within the Supreme Court's body of Presidential removal-power precedent establish, as the panel majority explains, that Congress's use and construction of independent agencies is subject to constitutional limitations, the outer boundary of which is the President's domestic executive authority under Article II.

Notwithstanding my agreement with this fundamental principle of law, I conclude that the FHFA's structure does not reach that boundary and therefore does not impinge on the President's oversight and removal authority. My reasoning substantially mirrors that of the D.C. Circuit's en banc majority opinion in *PHH Corporation*, which concluded that the CFPB's similar structure does not exceed constitutional constraints on the agency's makeup. Thus, and for reasons expressed by the en banc majority in *PHH Corporation*, I respectfully dissent from the panel majority opinion's conclusion that the FHFA's structure unconstitutionally restricts the President's removal power under Article II.

I elaborate to briefly address and distinguish a feature of the CFPB's structure that is absent from the FHFA. As the majority opinion notes, when Congress created the CFPB, it also created the Financial Stability Oversight Council ("FSOC"), 12 U.S.C. § 5321, which is composed of several members of the Executive Branch and independent agency heads chosen by the President who have substantial stay and veto authority over any rule promulgated by the Director that the FSOC believes might "put the safety and soundness of

the United States banking system or the stability of the financial system of the United States at risk." 12 U.S.C. § 5513. No such "mandatory oversight" committee, with stay and veto power, exists under HERA's provisions creating the FHFA. Rather, HERA created the Federal Housing Finance Oversight Board ("FHFOB"), 12 U.S.C. § 4513a(a). Two Executive Branch officials—the Treasury Secretary and the Secretary of Housing and Urban Development—are members of the FHFOB, *see id.* § 4513(c). However, unlike the FSOC, the Board may not "exercise any executive authority" and may not be delegated "any functions, powers, or duties of the Director." *Id.* § 4513a(b). The FHFOB's involvement in the FHFA Director's execution of his statutory mandate is limited to "advis[ing] the Director with respect to overall strategies and policies in carrying out" his duties. *Id.* § 4513a(a). The panel majority opinion highlights the advisory status of the FHFOB as further removing the FHFA from Presidential oversight.

The mandatory-versus-advisory oversight distinction, although important, does not meaningfully alter the constitutional analysis in this case. Notably, the FHFA is not the only single-leader independent agency subject to the "mere advice" of an advisory board. The Social Security Act created the Social Security Advisory Board ("SSAB") which is statutorily required to "advise" the Social Security Commissioner "on policies related to" the availability of benefits to Social Security beneficiaries. 42 U.S.C. § 903(b). The SSAB's functions are largely limited to "making recommendations" with respect to several aspects of the Administration's duties, *see id.* § 903(b), and the SSAB is not statutorily authorized to exercise veto power over the Commissioner's decisions.

Further, even without mandatory oversight authority, the FHFOB wields some sway over the FHFA Director's exercise of his statutory power.

The Director is required to meet with the FHFOB at least once every three months and must at the very least subject himself to their advice. *See* 12 U.S.C. § 4513a(a), (d)(1). And once every year, the FHFOB must testify before Congress regarding, *inter alia*, the "operations, resources, and performance of the [FHFA]" and "such other matters relating to the [FHFA] and its fulfillment of its mission," *id.* § 4513a(e)(5), (6). At these Congressional hearings, the FHFOB may either testify in support of the Director's leadership or testify that the Director has derogated from his duties under HERA, thereby providing grounds for the President to exercise his "prerogative to consider whether any excesses amount to cause for removal." *PHH Corp.*, 881 F.3d at 106. Although giving the FHFOB a more active role in the promulgation of policy decisions would more explicitly submit the Director to Executive Branch *control*, when it comes to independent agencies, control in the sense encouraged by the panel majority opinion is not required by the Constitution. An advisory board both preserves permissible agency independence and exposes the FHFA Director to policy perspectives held by Executive Branch officials immediately answerable to the President and, thereby, the President, thus achieving the oversight and accountability necessary to satisfy Article II.

Neither the for-cause removal restriction nor the single-leader feature of the FHFA's structure place the agency outside the Presidents purview in violation of the Constitution or the Supreme Court's removal jurisprudence. Nor does the absence of a mandatory oversight board in this case unduly inhibit the President's ability to remove the Director or oversee the goings-on of the FHFA. For the foregoing reasons, I respectfully dissent.

No. 17-20364

WILLETT, Circuit Judge, dissenting in part:

Desperate times breed desperate measures. Exhibit A is the Housing and Economic Recovery Act of 2008 ("HERA"), enacted after the United States housing bubble burst and triggered a massive mortgage-security and general-credit crisis. Nobody disputes that Congress created the Federal Housing Finance Authority ("FHFA") amid a dire financial calamity. The situation, both domestic and international, was grim and worsening quickly:

- housing market—melting down
- national economy—circling the drain
- global financial system—teetering on collapse

The FHFA was cast as a silver bullet, a super-agency endowed with far-reaching regulatory authority to stanch the bleeding and to restore liquidity to the U.S. housing and financial markets.

But contrary to how other federal courts have so far ruled on this issue (including this court's opinion today), Congress did not vest the FHFA with unbounded, unreviewable power. The FHFA—like any agency—is restrained by the four corners of its enabling statute: "An agency literally has no power to act . . . unless and until Congress confers power upon it."[1] Every agency requires a defined statutory basis for its actions. Absent a valid delegation of authority, an agency's actions are dubious at best, and contrary to bedrock constitutional principles at worst. Exigency does not justify conferring nigh-unchecked power on an agency insulated from judicial review. Expedience does not license omnipotence.

This case concerns whether the net worth sweep falls within the scope of the FHFA's statutory authority as conservator. To answer the question before

---

[1] *New York v. FERC*, 535 U.S. 1, 18 (2002).

us, we need only look to HERA's plain text. And it is our duty to ensure that the FHFA operates squarely within the bounds of its statutory authority.

Regrettably, the majority opinion does otherwise. The upshot is a lucrative limbo: Mortgage-finance giants Fannie Mae and Freddie Mac are forever trapped in a zombie-like trance as wards of the state, bled of their profits quarter after quarter in perpetuity. In rejecting the Shareholders' statutory claims, the majority opinion embraces the views of our sister circuits, adopting "the same well-reasoned basis common to those courts' opinions."[2] But what the majority opinion finds convincing, I find confounding.

With respect I dissent.

# I

In essence, the judicial consensus is that HERA's anti-injunction provision bars the Shareholders claims because (1) the text of HERA does not require the FHFA as conservator to "preserve and conserve" the assets of these colossal government-sponsored enterprises ("GSEs");[3] and (2) regardless, the net worth sweep is consistent with the FHFA's statutory authority.[4]

Respectfully, this reading, while popular, flouts HERA's plain text, which should be the North Star of our analysis. HERA tells us two important things. First, the anti-injunction provision bars only claims that would "restrain or affect" the FHFA's statutory powers *as conservator* (not the case

---

[2] Maj. Op. at 15.

[3] *Roberts v. Fed. Hous. Fin. Agency*, 889 F.3d 397, 403–04 (7th Cir. 2018); *Robinson v. Fed. Hous. Fin. Agency*, 876 F.3d 220, 232 (6th Cir. 2017); *Perry Capital L.L.C. v. Mnuchin*, 864 F.3d 591, 607–09 (D.C. Cir. 2017).

[4] *Roberts*, 889 F.3d at 404 (characterizing the Shareholders' claims as "whether the Agency made a poor business judgment"); *Robinson*, 876 F.3d at 231; *Perry Capital*, 864 F.3d at 607 ("FHFA's execution of the Third Amendment falls squarely within its statutory authority to operate the Companies, to reorganize their affairs, and to take such action as may be appropriate to carry on their business." (cleaned up)).

here).[5] Second, the FHFA does not have unfettered discretion to dispose of the GSEs' assets and property at will so long as it dons the conservator cowl.

By enacting the net worth sweep in the Third Amendment, the FHFA exceeded the scope of its statutory authority as conservator. HERA makes clear that the FHFA may operate *either* as conservator *or* receiver at any given time. The statute then provides a list of role-specific duties. As conservator, the FHFA must "preserve and conserve the assets and property" of the GSEs.[6] This statutory command is mandatory, not discretionary. Stripping the GSEs of their cash reserves by depriving them of their net worth—*in perpetuity*—is antithetical to this "preserve and conserve" requirement. This permanent pillaging of capital violates the FHFA's obligation as conservator to "put the [GSEs] in a sound and solvent condition."[7] The sweep siphons the GSEs' net worth quarter after quarter—all but guaranteeing that they will draw on Treasury's funding commitment, increasing its liquidation preference. This action is fundamentally incompatible with the FHFA's statutory mandate as conservator. Indeed, Congress specifically permits the FHFA to perform this action *as receiver*, yet the FHFA seeks to evade the carefully crafted statutory scheme by proposing an impermissibly broad, and unnecessarily encroaching, view of its powers as conservator. This overstep cannot sidestep judicial review.

According to the majority opinion, however, there is essentially *no* limit to the FHFA's conservatorship authority, and courts are powerless to intervene

---

[5] All courts agree: HERA's anti-injunction provision does not apply when a plaintiff "properly alleges that 'FHFA acted beyond the scope of its conservator power.'" *Robinson*, 876 F.3d at 228 (quoting *Cty. of Sonoma v. Fed. Hous. Fin. Agency*, 710 F.3d 987, 992 (9th Cir. 2013)); *see also Roberts*, 889 F.3d at 402; *Perry Capital*, 864 F.3d 591, 605; *accord id.* at 638, 641 (Brown, J., dissenting in part). The Shareholders have made this showing.

[6] 12 U.S.C. § 4617(b)(2)(D)(ii).

[7] *Id.* § 4617(b)(2)(D)(i).

so long as the FHFA operates under the guise of "conservator." The majority opinion's conception of conservatorship is foreign to this (or any) court. Adopting this exotic approach betrays the letter and the spirit of limitations provided by HERA, and ultimately allows the FHFA to raze our established principles governing administrative entities.

I cannot endorse such a willy-nilly delegation of authority to an administrative entity impervious to meaningful judicial review. The FHFA's professed power is something special—so spacious it's specious. In terms of unfettered clout, the FHFA has no rival across the federal agency landscape. But unfettered must never be unfretted. Agencies must always operate within the carefully crafted statutory schemes that govern their existence. And while the FHFA's averred authority as conservator is audacious, it is not limitless.

I cannot join the majority opinion's conclusion that the Shareholder's statutory claims are barred by HERA's anti-injunction provision.

## II

Agencies require statutory authorization for their actions. The full extent of FHFA's authority as conservator is thus found within HERA's text.[8] As we recently made clear, "the text is the alpha and the omega of the interpretive process."[9] So I begin with the language Congress actually used.

Congress created the FHFA to supervise and regulate the GSEs and Federal Home Loan banks.[10] HERA granted the FHFA's director discretionary authority to place the GSEs in conservatorship. The statute authorizes the

---

[8] *See City of Arlington, Tex. v. FCC*, 569 U.S. 290, 317 (2013) (Roberts, C.J., dissenting) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

[9] *United States v. Maturino*, 887 F.3d 716, 723 (5th Cir. 2018); *see also New York*, 535 U.S. at 18 ("[W]e must interpret the statute to determine whether Congress has given [the agency] the power to act as it has.").

[10] 12 U.S.C. § 4511.

FHFA to "be appointed conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."[11] When serving as conservator or receiver, the FHFA enjoys an array of general powers enumerated in § 4617(b)(2). Once appointed as either conservator or receiver, the FHFA succeeds to the "rights, titles, powers, and privileges of the [GSE], and of any stockholder, officer, or director . . . with respect to the [GSE] and the assets of the [GSE]."[12] And the FHFA may assume the assets, business operations, and functions of the GSE, collect money due to the GSE, and "preserve and conserve the assets and property" of the GSE.[13] Finally, HERA permits the FHFA to exercise any function of any stockholder, director or officer of the GSE.[14]

These general powers, however, must be read in concert with the more specific powers enumerated for conservators and receivers, respectively. Acts of Congress should be read cohesively, contextually, and comprehensively, not "as a series of unrelated and isolated provisions."[15] Under our precedent, "it is a 'cardinal rule that a statute is to be read as a whole,' in order not to render portions of [a statute] inconsistent or devoid of meaning."[16] The majority opinion's focus on general powers ignores HERA's specific provisions governing how the FHFA is to behave.

Reading the statute holistically, it is clear that HERA outlines two distinct roles—conservator and receiver—that come with distinct powers. And

---

[11] *Id.* § 4617(a)(2) (emphasis added).

[12] *Id.* § 4617(b)(2)(A).

[13] *Id.* § 4617(b)(2)(B).

[14] *Id.* § 4617(b)(2)(C).

[15] *In re Burnett*, 635 F.3d 169, 172 (5th Cir. 2011) (quoting *Soliman v. Gonzales*, 419 F.3d 276, 282 (4th Cir. 2005)).

[16] *Id.* (quoting *Zayler v. Dep't of Agric. (In re Supreme Beef Processors, Inc.)*, 468 F.3d 248, 253 (5th Cir. 2006)).

No. 17-20364

when the FHFA acts as conservator, HERA imposes mandatory duties on the FHFA to "preserve and conserve" the GSEs' assets and property.

## A

Crucial to the issue before us today is that HERA distinguishes between the role of conservator and the role of receiver. The FHFA Director may designate the agency as *either* conservator *or* receiver, but once the FHFA is appointed as one or the other, its powers depend on the role. And HERA prescribes and proscribes those powers.

HERA explicitly provides that the FHFA may "be appointed as conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."[17] The statute uses the disjunctive "or," denoting that the FHFA may not act as both conservator *and* receiver simultaneously.[18] Indeed, the text further makes clear that these roles are mutually exclusive—appointing the FHFA as receiver "immediately terminate[s] any conservatorship established for the GSE."[19] The roles are distinctive, not cumulative.

So are the powers attaching to each role. Section 4617(b)(2)(D) specifies the FHFA's powers as conservator. The FHFA may take any action "necessary to put the [GSE] in a sound and solvent condition" and "appropriate to carry on the business of the [GSE] and preserve and conserve the [GSE's] assets and property."[20] By contrast, § 4617(b)(2)(E), (F) enumerates powers reserved to the FHFA as receiver—which include liquidating the GSE and organizing a

---

[17] 12 U.S.C. § 4617(a)(2).

[18] In ordinary use, the term "or" "is almost always disjunctive, that is, the words it connects are to be given separate meanings." *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014) (quoting *United States v. Woods,* 134 S. Ct. 557, 567 (2013)).

[19] 12 U.S.C. § 4617(a)(4)(D).

[20] *Id.* § 4617(b)(2)(D).

"successor enterprise" to operate the GSE.[21] Elsewhere, HERA emphasizes the contrasting nature of these powers. In operating the GSEs, the statute permits the FHFA to "perform all functions of the [GSE] in the name of the [GSE] which are *consistent with the appointment* as conservator or receiver."[22] This language echoes later in the statute. Under the incidental powers provision, the FHFA is empowered only to "exercise all powers and authorities specifically granted to conservators or receivers, *respectively*, under this section . . . ."[23] This use of "respectively" further severs the role of "conservator" from that of "receiver." HERA thus outlines a distinct vision for the FHFA's role as conservator and its role as receiver.

This distinction is not a mere procedural formality. When the FHFA acts as receiver, HERA imposes specific statutory requirements to protect the various rights and interests of creditors and investors.[24] These procedures exist to ensure that receivers "fairly adjudicate claims against failed institutions."[25] Liquidation is exclusively reserved for the FHFA when it acts as receiver.[26] In fact, liquidation is mandatory, leaving no hope to "rehabilitate" a GSE in receivership.[27] On the other hand, when the FHFA acts as conservator, it may take any action "necessary to put the [GSE] in a sound and solvent condition" and "appropriate to carry on the business of the [GSE] and preserve and conserve the [GSE's] assets and property."[28] These explicit grants of power to

---

[21] *See id.* § 4617(b)(2)(E), (F).

[22] *Id.* § 4617(b)(2)(B)(iii) (emphasis added).

[23] *Id.* (emphasis added).

[24] *See id.* § 4617(b)(3)–(9), (c).

[25] *Whatley v. Resolution Tr. Corp.*, 32 F.3d 905, 909–10 (5th Cir. 1994).

[26] *See* 12 U.S.C. § 4617(b)(2)(E), (F), (b)(3); 12 C.F.R. § 1237.3(b).

[27] *See* 12 U.S.C. § 4617(b)(2)(E) ("In any case in which the [FHFA] is acting as receiver, the [FHFA] *shall* place the [GSE] in liquidation." (emphasis added)).

[28] *Id.* § 4617(b)(2)(D).

the FHFA when it acts as conservator or receiver define the nature of authority in each role. In this light, the FHFA-as-conservator does not have authority to "wind[] up" the GSEs. That is inherently, textually, and exclusively the function of a receiver.

This plain-language interpretation of the FHFA's conservatorship powers follows our interpretation of near-identical language in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). Congress essentially cut-and-pasted the FHFA's powers and functions as conservator, including the anti-injunction provision, from FIRREA.[29] And it is a treasured canon of statutory interpretation that when "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law."[30] Thus, our interpretation of FIRREA must inform our interpretation of HERA.

FIRREA empowers the Federal Deposit Insurance Corporation ("FDIC") to act as conservator or receiver.[31] FIRREA also breaks down the powers and functions of the FDIC when it acts as conservator or receiver. Once appointed, the FDIC "succeed[s] to . . . all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director . . . with respect to the institution and the assets of the institution."[32] FIRREA also permits the FDIC to fully assume the assets, business operations, and functions of the institution, to collect money due to the institution, and to "preserve and conserve the assets and property" of the

---

[29] *Compare id.* § 1821(d)(2)(D) (FIRREA) *with id.* § 4617(b)(2)(D) (HERA).

[30] *Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85–86 (2006).

[31] 12 U.S.C. § 1821(c)(1).

[32] *Compare id.* § 1821(d)(2)(A)(i) *with id.* § 4617(b)(2)(A)(i).

institution.[33] Finally, the FDIC may also exercise any function by any stockholder, director or officer of the institution.[34]

This should sound familiar. Much of FIRREA's text and structure mirrors that of HERA. As under HERA, the conservator and receiver roles under FIRREA share common powers and functions, but they are plainly distinct. Among its general powers in operating the regulated entity, the FDIC may "perform all functions of the institution in the name of the institution which are *consistent with the appointment* as conservator or receiver."[35] And, like HERA, FIRREA enumerates specific, unique powers held by conservators[36] and by receivers.[37] FIRREA authorizes conservators to take "such action as may be . . . necessary to put the insured depository institution in a sound and solvent condition; and . . . appropriate to carry on the business of the institution and preserve and conserve [its] assets."[38] In particular, it notes the conservator's "fiduciary duty to minimize the institution's losses,"[39] whereas receivers "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution."[40] Though the conservator and receiver roles in FIRREA overlap in some respects, the duties reflect different interests and distinct powers.[41] Under FIRREA, the FDIC holds distinct roles when it acts as conservator or receiver with clearly delineated statutory bounds between the two roles.

---

[33] *Compare id.* § 1821(d)(2)(B) *with id.* § 4617(b)(2)(B).

[34] *Compare id.* § 1821(d)(2)(C) *with id.* § 4617(b)(2)(C).

[35] *Id.* § 1821(d)(2)(B)(iii) (emphasis added).

[36] *Id.* § 1821(d)(2)(D).

[37] *Id.* § 1821(d)(2)(E)–(F).

[38] *Id.* § 1821(d)(2)(D).

[39] *Id.* § 1831f(d)(3).

[40] *Id.* § 1821(d)(2)(E).

[41] *See McAllister v. Resolution Tr. Corp.*, 201 F.3d 570, 579 (5th Cir. 2000); *Resolution Tr. Corp. v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1451–52, 1454 (8th Cir. 1992).

No. 17-20364

We should read HERA consistently with our previous interpretation of FIRREA. Congress "can be presumed to have had knowledge of the interpretation given to the incorporated law."[42] So under HERA's nearly identical language, the FHFA as conservator exercises plainly distinct powers from the FHFA as receiver.

Nevertheless, the FHFA seeks to make bright lines blurry. First, it argues that "winding up is different from liquidation," so a conservator may take steps akin to winding up so long as they fall short of liquidation. Alternatively the FHFA argues that "HERA's plain text authorizes FHFA as 'conservator *or* receiver' to be appointed 'for the purpose of reorganizing, rehabilitating, *or winding up* the affairs'" of the GSEs. As a result, the FHFA can "wind up" the GSEs as either conservator or receiver. This argument convinced the D.C. Circuit, which rejected the idea that there is "a rigid boundary" between the FHFA's conservator and receiver roles.[43]

To be sure, both as a general matter and as a textual matter, conservators and receivers share some common functions under HERA. For example, the FHFA, acting as either conservator *or* receiver, may "transfer or sell any asset or liability" of the GSEs, "without any approval, assignment, or consent."[44] In fact, many powers granted to the FHFA are available to it in either role.[45]

---

[42] *See Yates v. United States*, 135 S. Ct. 1074, 1093 (2015) (Kagan, J., dissenting) (noting that only the most compelling evidence will persuade the Court that Congress intended identical terms used in similar contexts to bear different meanings); *Morissette v. United States*, 342 U.S. 246, 263 (1952).

[43] *Perry Capital*, 864 F.3d at 610.

[44] 12 U.S.C. § 4617(b)(2)(G).

[45] *See, e.g.*, *id.* § 4617(b)(2)(G) (power to transfer or sell assets or liability of GSE in default); *id.* § 4617(b)(2)(H) (power to pay certain obligations of GSE); *id.* § 4617(b)(2)(I) (power to issue subpoenas); *id.* § 4617(b)(2)(J) (incidental powers necessary for the FHFA to

No. 17-20364

Winding up the GSEs is not one of those powers. Reading HERA this way would be absurd: It would render the carefully crafted, mandatory, receiver-specific, wind-up procedures irrelevant.[46] There are no corresponding procedures for winding up the GSEs *during conservatorship*.[47] This silence is unsurprising. As conservator, the FHFA must "preserve and conserve" the GSEs' assets. In fact, the powers and functions unique to the FHFA as receiver—winding up and liquidating a GSE—are *antithetical* to the duties of the FHFA as conservator—rehabilitating a GSE and operating it as a going concern, preserving its assets.[48] If the FHFA wished to wind up the GSEs, it must first be designated as receiver.

This conclusion does not deny the FHFA discretion to exercise its lawful powers as conservator; it simply enforces it. The FHFA may not exercise powers reserved for receivers when it is designated as a conservator. HERA specifies discrete conduct that the FHFA may exercise in pursuit of its goals in either role.

All this boils down to the fact that the FHFA cannot hide behind the conservator label to insulate it from meaningful judicial review. The FHFA placed the GSEs into conservatorship. In making that designation, the FHFA is limited to its authority as a conservator under HERA.

---

execute its authority as conservator or receiver); *id.* § 4617(d)(1) (power to repudiate contracts or leases).

[46] *See id.* § 4617(b)(3)–(9), (c) (describing how to resolve claims against the GSEs during liquidation).

[47] *See id.* § 4617(b)(2)(D).

[48] *Id.* § 4617(a)(2), (b)(2)(D)–(E).

No. 17-20364

## B

Next, we must outline the contours of the FHFA's conservatorship authority. Understanding how HERA defines the FHFA's conservatorship role is essential to determining whether the FHFA exceeded its statutory authority.

HERA enumerates specific powers for the FHFA when it acts as conservator. The FHFA "may . . . take such action as may be . . . necessary to put the regulated entity in a sound and solvent condition; and . . . appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."[49]

These powers accord with the traditional understanding of the role of conservators at common law.[50] A conservator is "the modern equivalent of the common-law *guardian*" and a "managing conservator" is "[a] person appointed by a court to manage the estate or affairs of someone who is legally incapable of doing so."[51] And conservators had specific fiduciary duties: They were appointed to protect the legal interests of those unable to protect themselves.[52] According to the Congressional Research Service, "[a] conservator is appointed to operate the institution, conserve its resources, and restore it to viability."[53]

---

[49] *Id.* § 4617(b)(2)(D).

[50] "It is a settled principle of interpretation that, absent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'" *United States v. Castleman*, 134 S. Ct. 1405, 1410 (2014) (quoting *Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013)). And "absence of contrary direction may be taken as satisfaction with widely accepted definitions." *Morissette*, 342 U.S. at 263. Congress's use of the word "conservator" in HERA and FIRREA incorporates the tradition of fiduciary conservatorships at common law. *See, e.g.*, *Perry Capital*, 864 F.3d at 641 (Brown, J., dissenting in part) (construing FHFA conservatorship authority in light of common-law principles); *Matter of Still*, 963 F.2d 75, 77 (5th Cir. 1992) (construing FDIC receivership authority in light of common-law understandings).

[51] *Conservator*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis in original).

[52] *See, e.g.*, Unif. Prob. Code § 5-418.

[53] DAVID H. CARPENTER & M. MAUREEN MURPHY, CONG. RES. SERV., FINANCIAL INSTITUTION INSOLVENCY: FEDERAL AUTHORITY OVER FANNIE MAE, FREDDIE MAC, AND

No. 17-20364

Traditionally at common law, conservators thus owed certain obligations to their wards—power must be exercised for their benefit.

This common-law understanding forms the foundation on which Congress built FIRREA and later, HERA, authorizing agencies to serve as conservators for an entity by "preserv[ing] and conserv[ing]" its assets and operating it in a "sound and solvent" manner.[54] As explained above, we have interpreted FIRREA to "state[] explicitly that a conservator only has the power to take actions necessary to restore a financially troubled institution to solvency."[55] We are in good company—the Fourth, Eighth, Ninth, Eleventh, and D.C. Circuits have articulated similar views.[56] And the FDIC's own policy statements reflect its view that the conservatorship role imposes a duty to achieve "sufficient tangible capitalization" that reasonably assures "the future

---

DEPOSITORY                    INSTITUTIONS                    5                    (2008), https://digital.library.unt.edu/ark:/67531/metadc795484/m1/1/high_res_d/RL34657_2008Sep 10.pdf.

[54] *See* 12 U.S.C. § 1821(d)(2)(D); *id.* § 4617(b)(2)(D).

[55] *McAllister*, 201 F.3d at 579.

[56] *See, e.g.*, *James Madison Ltd. By Hecht v. Ludwig*, 82 F.3d 1085, 1090 (D.C. Cir. 1996) ("The principal difference between a conservator and receiver is that a conservator may operate and dispose of a bank as a going concern, while a receiver has the power to liquidate and wind up the affairs of an institution."); *Elmco Props., Inc. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914, 922 (4th Cir. 1996) ("[A] conservator's function is to restore the bank's solvency and preserve its assets."); *Del E. Webb McQueen Dev. Corp. v. Resolution Tr. Corp.*, 69 F.3d 355, 361 (9th Cir. 1995) ("The [Resolution Trust Corporation ("RTC")], as conservator, operates an institution with the hope that it might someday be rehabilitated. The RTC, as receiver, liquidates an institution and distributes its proceeds to creditors according to the priority rules set out in the regulations."); *Resolution Tr. Corp. v. United Tr. Fund, Inc.*, 57 F.3d 1025, 1033 (11th Cir. 1995) ("The conservator's mission is to conserve assets which often involves continuing an ongoing business. The receiver's mission is to shut a business down and sell off its assets."); *CedarMinn*, 956 F.2d at 1453 (noting that a conservator's "mission[]" is "to take action necessary to restore the failed [financial institution] to a solvent position and to carry on the business of the institution and preserve and conserve the assets and property of the institution" (quoting 12 U.S.C. § 1821(d)(2)(D)).

viability of the institution."[57] Importantly, a conservator must "minimize the institution's losses" and ensure "the future viability of the institution," whereas a receiver liquidates and realizes upon the assets of the institution.

Before this litigation, the FHFA itself agreed with this understanding of its authority as conservator. The FHFA acknowledged publicly that "[t]he purpose of conservatorship is to preserve and conserve each company's assets and property and to put the companies in a sound and solvent condition."[58] The FHFA has repeatedly emphasized that HERA "required" it to restore the GSEs to soundness and to "preserve and conserve" the GSEs' assets.[59] And its own regulations highlight that "the essential function of a conservator is to preserve and conserve the institution's assets," and "[a] conservator's goal is to continue the operations of a regulated entity, rehabilitate it[,] and return it to a safe, sound[,] and solvent condition."[60] Neither winding up nor liquidating an entity, whether synonymous or not, are consistent with this mission.

Now, however, the FHFA no longer thinks a conservator must conserve. The FHFA argues that HERA's conservatorship powers "bear no resemblance

---

[57] Statement of Policy on Assistance to Operating Insured Depository Institutions, 57 Fed. Reg. 60203, 60205 (Dec. 18, 1992).

[58] Fed. Hous. Fin. Agency, Report to Congress: 2009, at i (May 25, 2010), https://www.fhfa.gov/AboutUs/Reports/ReportDocuments/2009_AnnualReportToCongress_5 08.pdf (acknowledging "[t]he purpose of conservatorship is to preserve and conserve each company's assets and property and to put the companies in a sound and solvent condition").

[59] *See* Fannie Mae and Freddie Mac Loan Purchase Limits: Request for Public Input on Implementation Issues, 78 Fed. Reg. 77450, 77451 (Dec. 23, 2013) (describing the authority to "preserve and conserve" the GSEs' assets as "FHFA's conservator *obligation*" (emphasis added)); 2012-2014 Enterprise Housing Goals, 77 Fed. Reg. 67535, 67549 (Nov. 13, 2012) ("FHFA's *duties* as conservator *require* the conservation and preservation of the [GSEs'] assets." (emphasis added)); Conservatorship and Receivership, 76 Fed. Reg. 35724, 35726 (June 20, 2011) (describing FHFA's authority under § 4617(b)(2)(D) as its "*statutory mission* to restore soundness and solvency to insolvent regulated entities and to preserve and conserve their assets and property" (emphasis added)).

[60] Conservatorship and Receivership, 76 Fed. Reg. 35724, 257327, 35730 (June 20, 2011).

to the type of conservatorship measures that a private common-law conservator would be able to undertake," and Congress empowered the FHFA to act in its own best interests under the "incidental powers" provision. In essence, the FHFA contends that the incidental powers provision represents a clear, contrary intention by Congress to displace the common-law interpretation of "conservator."

Other circuits have found this argument persuasive. They believe Congress explicitly delegated authority that exceeds the customary meaning of conservator, so the FHFA complied with its general statutory mandate in adopting the net worth sweep.[61] First, they conclude that the FHFA is not a traditional conservator because "Congress granted FHFA a broad array of discretionary authority"—by framing HERA in terms of permissive authority, Congress intended the FHFA to exercise its discretion and it is not required to pursue binding duties under § 4617(b)(2)(D) when it acts as conservator.[62] Second, they find that the FHFA is not a traditional conservator because express powers granted by HERA's incidental powers permit the FHFA to take its own interests into account when performing its duties as conservator, conflicting with the customary meaning of conservatorships.[63]

---

[61] *See, e.g.*, *Robinson*, 876 F.3d at 229–30 (finding that the statute is framed in terms of discretionary authority and that express powers conflict with traditional notions of conservatorships); *Perry Capital*, 864 F.3d at 613 ("Congress made clear in the Recovery Act that the FHFA is not your grandparents' conservator.").

[62] *Robinson*, 876 F.3d at 229–30; *see also Roberts*, 889 F.3d at 403 ("[S]ection 4617(b)(2)(D) does not *require* the Agency to do anything. It uses the permissive 'may,' rather than the mandatory 'shall' or 'must,' to introduce the Agency's power as conservator to 'preserve and conserve' Freddie's and Fannie's assets and to restore their solvency."); *Perry Capital*, 864 F.3d at 607 ("The statute is thus framed in terms of expansive grants of permissive, discretionary authority for FHFA to exercise as the 'Agency determines is in the best interests of the regulated entity or the Agency.'" (quoting 12 U.S.C. § 4617(b)(2)(J))).

[63] *Robinson*, 876 F.3d at 230; *Perry Capital*, 864 F.3d at 613.

No. 17-20364

There is a textual hook in finding that Congress granted the FHFA discretionary authority. HERA provides that the FHFA "may . . . take such action as may be . . . necessary to put the regulated entity in a sound and solvent condition; and . . . appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."[64] Typically, "may" implies discretion.[65] I do not doubt that "may means may" or that "'may is, of course, 'permissive rather than obligatory.'"[66] But courts seeking a forthright interpretation should not myopically focus on "may" at the expense of reading HERA as a cohesive, contextual whole. In divining statutory meaning, courts must never divorce text from context.[67]

Once again, "[a]n agency literally has no power to act . . . unless and until Congress confers power upon it."[68] Here, "may" *enables* the FHFA to act—the FHFA *may* take any action as conservator that is either (1) "necessary to put the [GSE] in a sound and solvent condition" or (2) "appropriate to carry on the business of the [GSE] *and* preserve and conserve" GSE assets and property.[69] Logically, the FHFA may *not* take an action that is inconsistent with this express list of powers.[70] Any other reading would render the FHFA's enumeration of specific conservator powers meaningless. Section

---

[64] 12 U.S.C. § 4617(b)(2)(D) (emphasis added).

[65] *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016).

[66] *Perry Capital*, 864 F.3d at 607 (quoting *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 608 (D.C. Cir. 2016); *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 63 (D.C. Cir. 2010)).

[67] *See, e.g.*, *Torres v. Lynch*, 136 S. Ct. 1619, 1626 (2016) (explaining that courts must "interpret the relevant words [of a statute] not in a vacuum, but with reference to the statutory context" (quoting *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014))).

[68] *New York*, 535 U.S. at 18.

[69] 12 U.S.C. § 4617(b)(2)(D) (emphasis added).

[70] Under the negative implication interpretive canon, *expressio unius est exclusio alterius*, the specification of one thing implies the exclusion of the other. Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012); *see also Texas v. United States*, 809 F.3d 134, 182 (5th Cir. 2015) (noting the utility of *expressio unius* for interpreting statutes in the administrative law field).

4617(b)(2)(D), though framed permissively, thus circumscribes the FHFA's powers as conservator—any action it takes must be consistent with its mission to "preserve and conserve" the GSEs' assets.

Nor does HERA's incidental powers provision give the FHFA carte blanche to ignore its statutory mandate as conservator. Under its incidental powers, the FHFA may "exercise all powers and authorities specifically granted to conservators or receivers, respectively, under this section, and such incidental powers as shall be necessary" to carry them out.[71] And the FHFA may "take any action authorized by this section, which the [FHFA] determines is in the best interests of the [GSE] or the [FHFA]."[72] According to the Shareholders, and at least two other circuits, this provision includes a broad grant of permissive authority for the FHFA to do whatever it pleases based on its own self-interest.[73]

I doubt that Congress "in fashioning this intricate . . . machinery, would [] hang one of the main gears on the tail pipe."[74] Interpreting the incidental powers provision to include such sweeping authority would treat the incidental powers as ends unto themselves, swallowing the remainder of HERA's statutory text.

The incidental powers provision is not a freestanding source of authority to act. Instead, the provision is confined to "any action *authorized by this section*."[75] In essence, "incidental" powers must be "incidental" to *something*.

---

[71] 12 U.S.C. § 4617(b)(2)(J)(i).

[72] *Id.* § 4617(b)(2)(J)(ii).

[73] *See Robinson*, 876 F.3d at 232 (finding that the Third Amendment could be a valid use of the FHFA's incidental power as conservator); *Perry Capital*, 864 F.3d at 607–08 (noting that the incidental powers provision permits the FHFA to take any action which it determines is in its best interests).

[74] *Brannan v. Stark*, 342 U.S. 451, 463 (1952).

[75] 12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis added).

No. 17-20364

To support this reading, we need look no further than a dictionary; "incidental" means "[s]ubordinate to something of greater importance; having a minor role."[76] It is inconceivable that FHFA could exercise such free-wheeling authority under its "incidental" powers—wholly untethered from its specific powers as conservator or receiver.

And this broad reading ignores provisions granting the FHFA specific powers and functions as either conservator or receiver. The incidental powers provision references these powers and functions when it authorizes the FHFA to "exercise all powers and authorities specifically granted *to conservators or receivers, respectively.*"[77] Logically, any exercise of the FHFA's incidental powers must be in service of a power specifically provided by HERA.[78] It is only with reference to these specific powers that we may discern the scope of the FHFA's authority over the GSEs.[79]

Regardless, permitting the FHFA to act in its own best interests does not come close to providing the type of explicit instruction required to suggest that Congress displaced the common-law attributes of conservatorships.[80] The

---

[76] *Incidental*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[77] 12 U.S.C. § 4617(b)(2)(J)(i) (emphasis added).

[78] In some respects, the Court's analysis of the Necessary and Proper Clause, Article I's "incidental powers" provision, is instructive. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 560 (2012) (noting that "cases upholding laws under [the Necessary and Proper] Clause involved exercises of authority derivative of, and in service to, a granted power"); *McCulloch v. Maryland*, 4 Wheat. 316, 421 (1819) (noting that the general authority to pass laws "necessary and proper" to executing its powers are determined by the powers granted under the Constitution).

[79] *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (noting that it is a well-known canon of statutory construction that a specific provision of a statute governs the general, avoiding "the superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute'" (quoting *D. Ginsburg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932))).

[80] *Cf. Morissette*, 342 U.S. at 263.

FHFA possesses significant regulatory authority with the potential for reverberations throughout the United States economy. Given the importance of the FHFA's role and the potential disruption to financial markets, the incidental powers provision is insufficient to negate the assumption that the settled common-law meaning of conservator applies.[81] Instead, the provision merely permits the FHFA to engage in self-dealing transactions, an act otherwise inconsistent with the conservator role.[82]

The FHFA's topsy-turvy take on the notion of conservators upends our traditional understanding of fiduciary conservatorships, and I cannot endorse it. "Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations."[83] Conservator is one such term. We have consistently honed the meaning of conservator at common law and subsequently under FIRREA. This court should decline to follow FHFA through the looking glass to a world where conservators need not conserve.

Without the statutory command to "preserve and conserve" the GSEs' assets and property, the FHFA is left without any intelligible principle to guide its discretion as conservator. The FHFA is essentially permitted to take *any action*—unmoored from any statutory guidance—so long as it could plausibly defend its action as "reorganizing" the GSEs. This broad reading effectively

---

[81] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.").

[82] *See Perry Capital*, 864 F.3d at 643 (Brown, J., dissenting in part).

[83] *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) (citations omitted); *see also Lorillard*, 434 U.S. at 580–81 (noting that where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law").

eviscerates the carefully crafted statutory authority granted to the FHFA, permitting it to abandon its conservatorship mission.

In sum, the FHFA "is not empowered to jettison every duty a conservator owes its ward, and it is certainly not entitled to disregard the statute's own clearly defined limits on conservator power."[84] The FHFA cannot act contrary to HERA's conservator powers; any such action would not be "incidental" to its statutorily enumerated authority. Thus, the FHFA may act in its own interests as conservator, but its actions must otherwise be consistent with its statutory authority to "preserve and conserve" the GSEs' assets and operate the GSEs in a "sound and solvent" manner.

## III

Because the FHFA was appointed as conservator—not as receiver—we must consider whether the net worth sweep was consistent with "the duties, purpose, and actions of a prudent conservator."[85] The key question is whether the net worth sweep was designed to "preserve and conserve" the GSEs' assets and rehabilitate the GSEs by putting them in "sound and solvent condition."[86]

The FHFA's conservatorship began on a relatively optimistic note. Fannie and Freddie were publicly placed into conservatorship on September 6, 2008, after failed attempts to recapitalize the GSEs. At the time, the FHFA Director was concerned about the GSEs' ability to "operate safely and soundly," and he explained the conservatorship as "a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations."[87] In pursuit of its conservatorship goals, the

---

[84] *Perry Capital*, 864 F.3d at 643 (Brown, J., dissenting in part).

[85] *Leon Cty. v. Fed. Hous. Fin. Agency*, 700 F.3d 1273, 1278 (11th Cir. 2012).

[86] 12 U.S.C. § 4617(b)(2)(D).

[87] Statement of FHFA Director James B. Lockhart at News Conference Announcing Conservatorship of Fannie Mae and Freddie Mac, FHFA (Sept. 7, 2008),

No. 17-20364

FHFA enlisted Treasury to provide cash infusions that preserved the value of Fannie's and Freddie's assets, enhanced their ability to function in the housing market, and mitigated the systemic risk that contributed to an unstable market.[88] Per the PSPA, Treasury purchased $1 billion of senior preferred stock in each GSE from the FHFA in exchange for access to capital. Treasury also had a right to a 10% dividend and periodic commitment fee to compensate it for any capital provided to the GSEs. Treasury believed it had a "responsibility to both avert and ultimately address the systemic risk" of GSE debt and to "eliminate any mandatory triggering of receivership."[89] This is consistent with its role as conservator—fixing short-term deficits and returning entities to functioning market participants is the essence of conservatorships.

But everything changed under the Third Amendment. The net worth sweep fundamentally altered the PSPA between the FHFA and Treasury, replacing the fixed-rate 10% dividend with the right to sweep the GSEs' entire quarterly net worth after accounting for a $3 billion capital reserve buffer that would gradually fall to zero. Far from ensuring ongoing access to capital, the net worth sweep denied the GSEs access to approximately $130 billion in profit that was instead turned over to Treasury.[90] In essence, the sweep siphoned

---

https://www.fhfa.gov/Media/PublicAffairs/pages/statement-of-fhfa-director-james-b--lockhart-at-news-conference-annnouncing-conservatorship-of-fannie-mae-and-freddie-mac.aspx.

[88] *See* Questions and Answers on Conservatorship, FHFA (Sept. 7, 2008), https://www.fhfa.gov/Media/PublicAffairs/Pages/Fact-Sheet-Questions-and-Answers-on-Conservatorship.aspx.

[89] Fact Sheet: Treasury Senior Preferred Stock Purchase Agreement, U.S. Treasury Dep't (Sept. 7, 2008), https://www.treasury.gov/press-center/press-releases/Documents/pspa_factsheet_090708%20hp1128.pdf.

[90] *See* FHFA, Table 2: Dividends on Enterprise Draws from Treasury, https://www.fhfa.gov/DataTools/Downloads/Documents/Market-Data/Table_2.pdf.

nearly all of the GSEs' net worth between 2012 and the present day directly to a sole shareholder: Treasury. It is undisputed that Treasury has collected over $200 billion under the net worth sweep—well exceeding the $187.5 billion it loaned to the GSEs.[91] Treasury has now recovered far more than it invested in the companies between 2008 and 2012 under the PSPAs. Yet the GSEs remain on the hook for the $187.5 billion obtained from Treasury before the Third Amendment. Under the Third Amendment, Treasury has the right to retain the GSEs' net worth in perpetuity.

Indeed, the Agencies abandoned their original optimism for a more ominous outlook for the GSEs. Both Treasury and the FHFA thought the Third Amendment aimed to wind up the GSEs—in other words, the GSEs would not return to operating capacity. Treasury announced that the Third Amendment would "expedite the wind down of Fannie Mae and Freddie Mac" and ensure that the GSEs "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."[92] The FHFA Acting Director also noted that there "seems to be broad consensus that Fannie Mae and Freddie Mac will not return to their previous corporate forms," that the "preferred course of action is to wind down the [GSEs]," and that the Third Amendment "reinforce[d] the notion that the [GSEs] will not be building capital as a potential step to regaining their former corporate status."[93] Once

---

[91] *Id.*

[92] Press Release, Dep't of Treasury, *Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx.

[93] Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Sen. Comm. on Banking, Hous., & Urban Affairs (Apr. 18, 2013), https://www.fhfa.gov/Media/PublicAffairs/Pages/Statement-of-Edward-J-DeMarco-Acting-Director-FHFA-Before-the-US-Senate-Committee-on-Banking-Housing-and-Urban-Affa359.aspx.

again, in a report to Congress, the FHFA explained that it was "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac."[94] Treasury and the FHFA did not attempt to hide their intentions, or, if they did, they weren't very good at it. Instead, they proclaimed loudly and proudly that they wanted to transfer wealth from the Shareholders to Treasury in an effort to wind up Fannie's and Freddie's affairs.

But to wind up the GSEs' affairs, the FHFA needed to follow HERA's carefully crafted procedures. The FHFA could be designated as receiver for the GSEs and put them on the path to liquidation. But that is not the path that the FHFA chose—the FHFA was designated as *conservator*. By evading the receivership label, the FHFA could unilaterally bleed the GSEs' assets for its own use. The Shareholders were essentially denied their property rights in GSE assets. Even worse, the FHFA evaded any judicial oversight to ensure compliance with HERA's receivership procedures.

The Sixth, Seventh, and D.C. Circuits determined that the Third Amendment falls squarely within the FHFA's authority operate the GSEs, carry on business, transfer or sell assets, and do so in the GSEs' or its own best interests.[95] These courts characterize the Shareholders' complaint as attacking the "necessity or financial wisdom" of the net worth sweep, reasoning that "Congress could not have been clearer about leaving those hard operational calls to FHFA's managerial judgment."[96]

---

[94] FHFA, Report to Congress 2012, at 13 (June 13, 2013), https://www.fhfa.gov/AboutUs/Reports/ReportDocuments/2012_AnnualReportToCongress_508.pdf.

[95] *Robinson*, 876 F.3d at 231 (citing 12 U.S.C. § 4617(b)(2)); *Roberts*, 889 F.3d at 404; *Perry Capital*, 864 F.3d at 607.

[96] *Robinson*, 876 F.3d at 231 (quoting *Perry Capital*, 864 F.3d at 607); *Roberts*, 889 F.3d at 404 (quoting *Perry Capital*, 864 F.3d at 607).

No. 17-20364

Admittedly, judges are not experts at Byzantine financial dealings or long-term market strategy. But interpreting statutes is squarely in the judicial wheelhouse. The FHFA may not hide behind the label of conservator to insulate itself from meaningful judicial review. Instead, we must apply well-settled principles underlying conservatorships to determine if the FHFA's actions were within its statutory authority. Simply put, HERA requires the FHFA as conservator to act in a certain way, and the net worth sweep is inconsistent with those requirements. Draining the GSEs' entire net worth in perpetuity makes rehabilitation—a core function of conservatorships— impossible. The net worth sweep was thus inconsistent with what a conservator may do, under HERA or otherwise.

That the GSEs have returned to profitability is of no matter. This case concerns whether a discrete action by the FHFA falls within its statutory conservatorship authority. The net worth sweep strips the GSEs of their capital reserves, and it is thus antithetical to the FHFA's statutory command that it "preserve and conserve the assets and property" of the GSEs.[97] Yet the net worth sweep persists—and it persists indefinitely.

This violates the FHFA's principal duty as conservator to "put the [GSEs] in a sound and solvent condition."[98] One of the FHFA's regulatory duties over the GSEs is "to ensure that [the GSEs] operate[] in a safe and sound manner, including maintenance of adequate capital."[99] And FHFA regulations suggest that allowing this transfer of capital to Treasury, thereby depleting the conservatorship assets, is incompatible with its "statutory charge to work to restore a regulated entity in conservatorship to a sound and solvent

---

[97] 12 U.S.C. § 4617(b)(2)(D)(ii).
[98] *Id.* § 4617(b)(2)(D)(i).
[99] *Id.* § 4513(a)(1)(B).

condition."[100] Without capital reserves, the net worth sweep left the GSEs extremely vulnerable to market fluctuations and risked further reliance on Treasury's funding commitment. This risk increased each year as the reserve cap decreased, supporting the position that the net worth sweep is inconsistent with the statutory command to take actions "necessary to put the regulated entity in a sound and solvent condition.[101] The FHFA Director said it best: Allowing the GSEs to operate without a reserve buffer is "irresponsible."[102]

To be sure, the GSEs are now permitted to retain a $3 billion capital reserve amount under the net worth sweep.[103] But removing the GSEs' entire net worth beyond that reserve cap still risks increasing Treasury's liquidation preference. In fact, the GSEs have incurred additional debt in order to pay Treasury under the net worth sweep. Ordering the GSEs to further weaken their financial position in this manner is inconsistent with the FHFA's statutory authority.

Congress carefully delineated the FHFA's powers as conservator. And courts have a responsibility to ensure that the FHFA does not exceed those powers. By holding otherwise, the majority opinion forecloses any recourse the Shareholders have to ensure that their property rights are protected by HERA's mandatory procedures.

\* \* \*

---

[100] Conservatorship and Receivership, 76 Fed. Reg. 35724, 35727 (June 20, 2011).

[101] 12 U.S.C. § 4617(b)(2)(D)(i).

[102] Melvin L. Watt, Director, FHFA, Statement Before the U.S. House of Representatives Comm. on Fin. Servs. (Oct. 3, 2017), https://www.fhfa.gov/Media/PublicAffairs/pages/statement-of-melvin-l--watt,-director,-fhfa,-before-the-u-s--house-of-representatives-committee-on-financial-services.aspx.

[103] Melvin L. Watt, Director, FHFA, Statement on Capital Reserve for Fannie Mae and Freddie Mac (Dec. 21, 2017), https://www.fhfa.gov/Media/PublicAffairs/Pages/Statement-from-FHFA-Director-Melvin-L-Watt-on-Capital-Reserve-for-Fannie-Mae-and-Freddie-Mac.aspx.

No. 17-20364

In a legal system governed by the Rule of Law, investors rely on predictable, well-settled principles of conservatorships and receiverships and the consistent interpretation of these terms by courts. HERA established the FHFA in order to stabilize and restore confidence in the United States housing market. In drafting the statute, Congress built HERA on the foundation of FIRREA, importing the accompanying predictable, deep-dyed common-law principles of conservatorships. Importantly, when the FHFA acts as conservator, Congress requires it to "preserve and conserve" the property and assets of the GSEs.

The FHFA abandoned this duty as conservator when it enacted the net worth sweep, thus barring the GSEs from earning and maintaining a profit. In essence, the FHFA began to wind up the GSEs and place them into liquidation—a power reserved for its role as receiver.[104] But the FHFA had not been designated as receiver, and it disregarded the receiver-specific statutory protections afforded to the GSEs and their investors.

Nothing in the statute prevents the FHFA from being designated and acting as a receiver. Perhaps all this litigation could have been avoided had the FHFA done so. But the FHFA has made its statutory bed, and now it must lie in it. If the FHFA wishes to wind up the GSEs, it must comply with the statutory procedures designating itself as receiver and terminating the conservatorship first. Having failed to do just that, the FHFA exceeded its statutory authority.

HERA neither bars review of the Shareholders' APA claim nor authorizes the FHFA as conservator to bleed the GSEs profits in perpetuity. Because the majority opinion holds otherwise, I respectfully dissent.

---

[104] *See* 12 U.S.C. § 4617(a)(4)(D), (b)(2)(E), (b)(3), (c).